## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff*, | |
| **v.** | **CIVIL ACTION NO.** |
| **STATE OF MAINE,** | |
| *Defendant*. | |

## COMPLAINT

1.      Each year, the State of Maine ("Maine" or "State") segregates hundreds of children with mental health and/or developmental disabilities, referred to throughout as behavioral health disabilities, away from their families and communities in institutions in- and out-of-state.  These children do not need to be segregated.  The families of many of these children want them home.  Other families would choose to have their children live at home or in another family home if provided a meaningful opportunity to do so.  Maine administers its behavioral health service system for children in a manner that gives the families and guardians of these children no meaningful choice other than institutions.  This leaves hundreds of children separated from their families and segregated from their communities.

2.      The United States of America ("United States") brings this action to enforce the rights of Maine children with behavioral health disabilities who are unnecessarily segregated—or at serious risk of segregation—in institutions because Maine has failed to provide them access to the behavioral health services they need in the community.  These children (*i.e.*, individuals under the age of 21) make up the population at issue here, referred to throughout as children with behavioral health disabilities or simply children.

3.    When Maine children are placed in institutions, such as psychiatric hospitals, juvenile detention, and other residential facilities, they miss the chance to wake up in their own beds, to develop bonds with family and friends, and to go to school with their siblings and peers.

4.    In theory, Maine funds and administers an array of behavioral health services, which it uses Medicaid and other publicly funded programs to fund, that help children with disabilities avoid or recover from mental health crises and manage their behavioral health disabilities so that they can stay in their homes and communities.

5.    But, in reality, Maine fails to provide children access to community-based behavioral health services.  As a result, hundreds of children are segregated in institutions because they cannot access the community-based services they are entitled to receive.  Many more children are at serious risk of segregation because they cannot access Maine's community-based services in a meaningful or timely manner.  Maine's mental health crisis services for children are often unavailable.  When a child is in crisis, families are often directed to call the police or take the child to the emergency room.  This puts the child at risk of institutionalization. Similarly, because the behavioral health services children need to return home are often unavailable, children who are taken to the emergency room often get stuck there.  They are then sent to institutions.

6.    Most Maine children who have had to enter institutions could live at home with a family if they could access the services they need there.

7.    Children and their families would prefer for the children to live at home with services.

8.    Maine could prevent discrimination against children with behavioral health disabilities by making reasonable modifications to its service system.  With changes to Maine's

system to make community-based behavioral health services available to avoid the unnecessary segregation of children with behavioral health disabilities who need them, these children could live and thrive in their communities.  Maine could thereby enable children with behavioral health disabilities to avoid unnecessary segregation.

9.      Representatives of children across Maine have filed complaints with the United States describing how children want to live at home and how their families want them at home but that the children are stuck in institutions or face imminent institutionalization because Maine policies and practices make it hard for them to get services at home.

10.     The United States of America brings this lawsuit, seeking a judicial order compelling Maine to provide behavioral health services to children with disabilities in their homes and communities when they can be served there, rather than unnecessarily segregating them or placing them at serious risk of unnecessary segregation in institutions.  42 U.S.C. §§ 12131–34; 28 C.F.R. pt. 35.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, because it involves claims arising under federal law.   *See* 42 U.S.C. § 12133.   The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201–02.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to this action occurred in the District of Maine.

## PARTIES

13.     Plaintiff is the United States of America.

14.     Defendant, the State of Maine, is a public entity within the meaning of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(1), and is therefore subject to Title

II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. pt. 35.

## LEGAL BACKGROUND

15.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities."  42

U.S.C. § 12101(b)(1).

16.     In enacting the ADA, Congress found that "historically, society has tended to

isolate and segregate individuals with disabilities," and that "such forms of discrimination

against individuals with disabilities continue to be a serious and pervasive social problem."  *Id.*

§ 12101(a)(2).

17.     Title II of the ADA prohibits public entities from discriminating against people on

the basis of disability.  *Id.* § 12132.  A "public entity" includes any state or local government, as

well as any department, agency, or other instrumentality of a state or local government, and it

applies to all services, programs, and activities provided or made available by public entities,

such as through contractual, licensing, or other arrangements.  *Id.* § 12131(1); 28 C.F.R.

§ 35.130(b)(3)(i).

18.     Congress directed the Attorney General to issue a regulation implementing Title

II of the ADA.  42 U.S.C. § 12134.  The Title II regulation includes an "integration mandate,"

which requires public entities to "administer services, programs, and activities in the most

integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R.

§ 35.130(d).  The most integrated setting is one that "enables individuals with disabilities to

interact with nondisabled persons to the fullest extent possible."  *Id.* pt. 35, app. B.

19.     In *Olmstead v. L.C.*, the Supreme Court held that Title II prohibits the unjustified

segregation of individuals with disabilities.  527 U.S. 581, 597 (1999).  The Supreme Court explained that its holding "reflects two evident judgments."  *Id.* at 600.  First, the Supreme Court explained that unnecessary institutionalization of people with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.*  "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 601.

20.     Under Title II, as interpreted by the Supreme Court in the *Olmstead* decision, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected individuals do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other people with disabilities.  *Id.* at 607.

**MAINE'S BEHAVIORAL HEALTH SERVICE SYSTEM FOR CHILDREN**

21.     Maine administers and funds services for children with behavioral health disabilities through various agencies, departments, and programs.

22.     Behavioral health services help children with disabilities manage their behavioral health needs and learn the skills they need to be independent and engage with the community.

23.     For example, a child with a mental health diagnosis and autism may need several different behavioral health services, including help with personal care, supervision, redirection to prevent the child from wandering off, and one-on-one therapy.

24.     Maine offers behavioral health services in both community-based settings (such as family homes) and in segregated settings.

25.     But children with behavioral health disabilities struggle to remain at home or

return home from institutions due to barriers to accessing Maine's behavioral health services at home.

26.     Maine provides healthcare coverage to eligible children through its state and federally funded Medicaid program, known as MaineCare.  Maine also funds behavioral health services through other state and federal funding sources.

27.     Medicaid is a health care system created by federal law but administered by states that are subject to certain federal statutory requirements.  In broad terms, Medicaid's purpose is to provide government-funded health coverage and related services for low-income individuals and individuals with disabilities.  When these individuals receive authorized services from providers that are enrolled with Medicaid, the providers' costs are reimbursed with Medicaid funds.

28.     Federal law requires every state that participates in Medicaid to designate a state agency to administer its Medicaid services.  That agency must create a "Medicaid State Plan," which describes and defines the services that it will cover through Medicaid.

29.     Maine's Department of Health and Human Services ("DHHS") is responsible for administering MaineCare under Title XIX of the Social Security Act (the "Medicaid Act").  *See* Me. Rev. Stat. Ann. tit. 22, § 3173; 10-144-101 Me. Code R. § 1.02-1.

30.     Under the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") requirements of the Medicaid Act, DHHS must provide all medically necessary services to Medicaid-eligible children up to 21 years of age.  *See* 42 U.S.C. §§ 1396a(a)(43), 1396d(a), 1396d(r).

31.     DHHS administers behavioral health services for children up to their 21st birthday.

32.     Behavioral health services for children are primarily funded by MaineCare.

**Segregated Settings for Children with Behavioral Health Disabilities**

33.     Maine reimburses private institutional providers, such as hospitals and residential facilities, under MaineCare and other state and federal funding sources.

34.     Maine sets reimbursement payment rates for institutional providers.

35.     Maine has multiple psychiatric hospitals that serve children with behavioral health disabilities.

36.     Maine has general hospitals that have psychiatric units for children.

37.     Maine has general hospitals with emergency rooms, where children experiencing mental health crises may be taken.

38.     In addition to other institutions for children, Maine also has at least a dozen Children's Residential Care Facilities ("CRCFs"), which provide residential treatment services to children as young as five years old with behavioral health disabilities.

39.     CRCFs are inpatient care settings that serve only children with disabilities.

40.     During each month between January 2018 and June 2024, between 133 and 353 Maine children per month lived in Maine CRCFs to receive residential treatment services.

41.     During each month between January 2018 and June 2024, between 41 and 85 Maine children per month lived in out-of-state residential facilities to receive residential treatment services.

42.     According to data provided by the State, children sent to in-state CRCFs stayed there for an average of 246 days in fiscal year 2020.

43.     In hospitals, residential facilities, and other institutions, children with behavioral health disabilities are separated from their families and communities in congregate settings to receive services.

44.     In these settings, children with behavioral health disabilities have little to no interaction with people without disabilities other than the staff who serve them.

45.     Maine also sends children to its secure juvenile detention facility, Long Creek Youth Development Center ("Long Creek"), to receive behavioral health services.

46.     Maine owns and operates Long Creek.

47.     As explained further below, Maine uses Long Creek as a *de facto* psychiatric hospital.

48.     Contrary to state law requirements that children in the juvenile justice system be rehabilitated at home wherever possible, children with behavioral health disabilities are instead sent to or remain in Long Creek because it is the only setting where they can access behavioral health services.

49.     As a result, most children at Long Creek have behavioral health disabilities.

50.     Children who are held at Long Creek have few, if any, opportunities to see their families and friends or engage with their communities.

51.     These hospitals, residential facilities, and Long Creek are segregated settings.

## Community-Based Behavioral Health Services

52.     Maine licenses, certifies, or otherwise regulates private community-based behavioral health service providers.

53.     Maine pays private community-based behavioral health service providers with MaineCare and other state and federal funding.

54.     Maine sets reimbursement payment rates for community-based behavioral health service providers.

55.     Maine's community-based behavioral health services include crisis services for children experiencing behavioral health emergencies and longer-term behavioral health services for children living at home.

### Crisis Services

56.     DHHS operates a crisis hotline that dispatches mobile crisis teams who provide in-home assistance to children experiencing mental health crises.

57.     Maine claims that its crisis hotline is available 24 hours per day, 7 days per week.

58.     But parents and advocates report that the crisis hotline and mobile crisis teams are frequently unavailable—either because no one answers the phone, or because no teams are available to come to the child's home to help.

59.     Maine also has Crisis Stabilization Units ("CSUs") where children can receive short-term, inpatient care during a mental health crisis.

60.     Parents and providers report that CSU beds are frequently unavailable.

61.     Although children enrolled in MaineCare are eligible for various crisis services in the community, *see, e.g.*, 10-144-101 Me. Code R. § 65.05-1, many must enter emergency departments to get crisis services that Maine ostensibly offers in the community.

### Longer-Term Behavioral Health Services

62.     In addition to crisis services, Maine also offers longer-term behavioral health services through MaineCare.

63.     For instance, Maine claims to offer Assertive Community Treatment ("ACT"), an intensive, team-based service that includes crisis response, to children who are eligible for MaineCare.

64.     Although ACT is ostensibly an available service, Maine currently has only one ACT MaineCare provider, and very few children in Maine can find a provider and access the service.

65.     Maine also offers Rehabilitative and Community Support Services as well as Specialized Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations, which provide children with developmental disabilities—who may also have mental health disabilities—with assistance with activities of daily living and behavior management.

66.     There are lengthy waitlists for these services.  In recent publicly available data, Maine reported that, from March 2024 to June 2024, the average time that a child was on a waitlist for Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations was 167 days, while the average time that a child was on a waitlist for Specialized Rehabilitative and Community Support Services for Children with Cognitive Impairments and Functional Limitations was 357 days.

67.     Another service, called Children's Home and Community Based Treatment ("HCT"), is designed for children who are diagnosed with serious emotional disturbance, as defined in the MaineCare rules.

68.     HCT includes individual counseling, family counseling, and in-home services provided by trained staff.

69.     Children also face a long waitlist for HCT.  Maine has reported that, from March 2024 to June 2024, the average time a child was on a waitlist for HCT was 172 days.

70.     MaineCare also offers a service called Targeted Case Management that coordinates care for children with disabilities.

71.     In State Fiscal Year 2020, children with behavioral health disabilities waited an average of 328 days to receive Targeted Case Management.  Some of these children waited more than 650 days to receive Targeted Case Management.

72.     Maine previously offered more intensive care coordination statewide to MaineCare eligible children with behavioral health disabilities through a high-fidelity wraparound program called Maine Wraparound.

73.     High-fidelity wraparound is a comprehensive service delivery strategy that coordinates a wide net of resources for children with behavioral health disabilities, including family and community resources, to support these children in the community.

74.     While it was offered, Maine Wraparound was critical in preventing significant numbers of Maine children with behavioral health disabilities from being placed in institutions.

75.     Maine's statewide wraparound program also resulted in significant cost savings to the State, because Maine Wraparound successfully diverted children from expensive institutionalization.

76.     Although Maine discontinued its Maine Wraparound program, Maine has stated that it intends to reintroduce high-fidelity wraparound services for MaineCare eligible children. Despite setting aside funds for these wraparound services, Maine has spent little of the funds it estimated it would need to re-establish high-fidelity wraparound.  Maine therefore is not on track

to make high fidelity wraparound available to the many children with behavioral health disabilities who qualify.

77.     Currently, Maine offers high-fidelity wraparound to only a limited number of youth who are involved in the juvenile justice system.

### Therapeutic Foster Care

78.     DHHS also administers Maine's child welfare system.

79.     Children are removed from their homes and enter the child welfare system following claims that they were neglected or abused by their parents, legal guardian, or custodian.

80.     Maine's child welfare system offers a specialized form of foster care, known as Therapeutic Foster Care, for children with behavioral health needs in the child welfare system.

81.     Therapeutic Foster Care parents are trained, supervised, and supported by qualified staff to care for foster children with behavioral health disabilities.

82.     Therapeutic Foster Care parents are contracted by private placement agencies that are licensed through the Office of Child and Family Services, which is housed within DHHS.

83.     Maine does not offer sufficient incentives to encourage the needed number of Maine adults to become licensed Therapeutic Foster Care parents.

84.     Maine does not recruit enough Therapeutic Foster Care parents to serve eligible children with behavioral health disabilities.

85.     Maine does not provide Therapeutic Foster Care parents with the training or services they need to support foster children with behavioral health disabilities.

86.     As a result, there are too few Therapeutic Foster Care parents in Maine to serve eligible foster children with behavioral health disabilities.

87. Foster children with behavioral health disabilities therefore enter and remain in segregated settings unnecessarily while they await Therapeutic Foster Care placements.

88. Other children with behavioral health disabilities are at risk of entering segregated settings if they enter the foster system.

89. Maine previously offered an additional option, called Multidimensional Therapeutic Foster Care, for children other than those in the child welfare system.

90. When it existed, Multidimensional Therapeutic Foster Care placed children with behavioral health disabilities with specially trained foster parents so that these children could receive services in a home-based setting and maintain legal and social ties to their families.

91. Multidimensional Therapeutic Foster Care helped avoid institutionalization of children who were not in the child welfare system but whose families could not care for them at home, for example due to a parent's illness or the needs of other children in the home.

92. Maine plans to re-establish this program but does not currently make it available to those who qualify.

## Maine's Community-Based Services Are Not Available when Children with Behavioral Health Disabilities Need Them, Resulting in Unnecessary Segregation or Serious Risk of Such Segregation

93. Maine's behavioral health system makes it difficult for children with behavioral health disabilities to access community-based services to prevent segregation and serious risk of segregation.

### *Maine Has Long Waitlists for Community-Based Services*

94. Maine maintains separate waitlists for each community-based behavioral health service that it offers to children with behavioral health disabilities.

95. But children with behavioral health disabilities who would be ready to return to

the community with appropriate services remain in segregated settings due to Maine's waitlists for community-based behavioral health services.

96.     For each month between January 2023 to June 2024, at least 400 children waited to receive at least one community-based service.

97.     When faced with months of waiting for community-based services, children with behavioral health disabilities are at serious risk of entering institutions to receive care.

98.     These children may enter institutions directly, or through hospital emergency rooms or law enforcement involvement, when they experience behavioral health crises because they cannot access the services they need in the community.

### *Maine Does Not Invest in Community-Based Providers*

99.     Community-based providers are service providers that provide community-based behavioral health services.

100.    Maine reimburses community-based providers through MaineCare and other state and federal funding sources.

101.    Maine sets reimbursement payment rates for community-based providers.

102.    Maine's own recent report reiterated that "[s]ervice availability and accessibility is undoubtedly one of the most significant factors impacting" children's behavioral health services.

103.    This lack of service availability and accessibility in the community places children currently living at home with their families at serious risk of entering institutions.

104.    Under the Medicaid Act's EPSDT provision, states must provide access to providers so that children can get required services.

105.    Providers need support, guidance, and technical assistance from the State to

provide community-based services to avoid the needless segregation of children with behavioral health disabilities.

106.    Maine does not offer incentives or support to ensure that the State's network of providers can serve children with behavioral health disabilities in the community.

107.    Maine also has complicated application and approval processes for certain community-based services like respite care,[1] which discourage potential providers from signing up to provide those services.

108.    For certain services in some areas of the State, there are no community-based providers at all.

109.    Even where providers are available, the demand for community-based services far outpaces providers' ability to provide those services.

110.    And Maine does not ensure that providers serve eligible children with behavioral health disabilities.

111.    Due to Maine's failure to address its gap in community-based services, children with behavioral health disabilities are forced to enter or remain in institutions to get services.

112.    Due to Maine's failure to address its gap in community-based services, children with behavioral health disabilities are at serious risk of entering institutions to get services.

113.    Long Creek, Maine's juvenile detention facility, both provides behavioral health services and cannot refuse to serve any children.

---

[1] Respite care provides trained temporary alternate caregivers so that parents and guardians can take care of other needs or travel, much the same way a neighbor or babysitter provides temporary care to a child without a disability.

*Maine's Crisis Services Are Often Unavailable*

114.    Since Maine's crisis services are often unavailable, children with behavioral health disabilities may enter hospital emergency rooms during behavioral health crises.

115.    Children with behavioral health disabilities have stayed in hospital emergency rooms for weeks or months because there are no community-based services available.

116.    Families are forced to choose between bringing their children with behavioral health disabilities home from the hospital with no services in place or sending their children to residential facilities.  The lack of available community-based services causes many children with behavioral health disabilities to enter residential facilities and places others at serious risk of entering those facilities.

117.    When crisis services are unavailable, crisis staff have told families to call the police.

118.    Hospitals and residential facilities have also called the police while children are experiencing behavioral health crises.

119.    Law enforcement officers are not mental health professionals and so, in general, they cannot effectively provide behavioral health services.

120.    And when law enforcement officers respond to a child's mental or behavioral health crisis, they may interpret the child's disability-related behaviors, such as not responding to police commands, as criminal activity.

121.    Law enforcement contact places children in behavioral health crisis at serious risk of entering institutions such as Long Creek.

### *Maine Uses Its Juvenile Detention Facility as a De Facto Psychiatric Facility*

122.     Once law enforcement is involved, juvenile justice officers may charge the child with a crime based on their disability-related behaviors and recommend that the child be placed at Long Creek.

123.     Maine's juvenile justice law requires the State to provide juvenile justice rehabilitative services in the least restrictive setting—typically a family home—with few exceptions.

124.     But children with behavioral health disabilities are sent to or remain in Long Creek because of the insufficient behavioral health services available to them in the community.

125.     As a result, children with behavioral health disabilities whose needs could be met with community-based services become institutionalized at Long Creek, or are at serious risk of entering Long Creek, to receive behavioral health services.

126.     Long Creek is not an appropriate therapeutic setting for children who are having behavioral health crises.

127.     For instance, according to recent reports, children may be locked in their cells for up to 23-hours per day.  Children may also be subjected to use of force, which results in trauma. These practices have only increased instances of mental health crises and suicide watches at Long Creek.

128.     In 2016, Maine's Department of Corrections reported that 84.6% of youth arrive at Long Creek with three or more mental health diagnoses.

129.     In 2020, a State-commissioned assessment of Maine's juvenile justice system found that approximately 70% of a sample of children committed to Long Creek had received behavioral health services through MaineCare within the year prior to their incarceration.

130.    In testimony before the State Legislature, Maine's Department of Corrections Commissioner stated that despite efforts to reduce detention solely to provide care to children, "some of our youth are at Long Creek because there are no other options."

131.    Maine thereby uses Long Creek as a *de facto* psychiatric hospital.

***Maine Does Not Invest in Therapeutic Foster Care***

132.    Maine is responsible for administering training, supports, and services to Therapeutic Foster Care parents so that these parents can meet their foster children's behavioral health disabilities at home.

133.    Maine fails to recruit, train, and support Therapeutic Foster Care parents to serve eligible children with behavioral health disabilities who are in the child welfare system.

134.    Because of Maine's lack of support, few Therapeutic Foster Care placements are available.

135.    Foster children with behavioral health disabilities therefore frequently remain institutionalized in psychiatric hospitals or other segregated settings long after they are ready for discharge.

136.    Some foster children with behavioral health disabilities have been dropped off at homeless shelters because Maine did not secure community-based services for their care, including Therapeutic Foster Care.

137.    Children in Maine's child welfare system are overrepresented in institutions.

138.    Since Maine discontinued the Multidimensional Therapeutic Foster Care option, there is a lack of home-based options for children who are not in the child welfare system but who cannot live with their family of origin for various reasons.

**Maine Children with Behavioral Health Disabilities Are Qualified to Receive
Services in the Community and Could Be Served with Appropriate
Community-Based Services and Supports**

139.    Children with behavioral health disabilities segregated in hospitals, residential

facilities, and Long Creek are eligible for MaineCare and other state and federally funded

behavioral health services that Maine administers.  Behavioral health disabilities are mental or

physical impairments that substantially limit one or more major life activities, as defined in 28

C.F.R. § 35.108.

140.    Children with these disabilities living in the community, but who are at serious

risk of entering institutions, are eligible for MaineCare and other state and federally funded

behavioral health services that Maine administers.

141.    With appropriate services, children with behavioral health disabilities can live at

home with their families and be fully integrated into their communities.

142.    Children with behavioral health disabilities in hospitals, residential facilities, and

Long Creek, and those living in the community but at risk of entering these settings, are qualified

to receive community-based behavioral health services.

143.    Children with behavioral health disabilities who live in the community but are at

serious risk have lived at home with their disabilities and can continue living at home if they

receive the behavioral health services they need.  Community-based behavioral health services

are appropriate for these children.

144.    Many children who are currently living in institutions have similar diagnoses and

behavioral health disabilities as other children who are already living and receiving services in

the community.  With appropriate community-based services, these children could also live at

home.

145.     Many children with behavioral health disabilities who are currently living in institutions have previously lived and received behavioral health services at home, and the vast majority could return home with community-based services.  Community-based behavioral health services are appropriate for these children.

146.     Institutional providers in Maine consistently report that there are children in their facilities who would be ready to return home if community-based services were available. Community-based behavioral health services are appropriate for these children.

147.     Staff and administrators at Long Creek have repeatedly estimated that many of the children who are currently held at Long Creek could be released to the community if appropriate mental health programs and services were available.

148.     Although children with behavioral health disabilities are qualified for community-based services and such services are appropriate for them, these children remain in segregated settings or are at serious risk of segregation.

### Children with Behavioral Health Disabilities and Their Families Would Not Oppose Community Living

149.     Children with behavioral health disabilities and their families overwhelmingly do not oppose the children being served in the community with appropriate services and supports.

150.     Children with behavioral health disabilities want to live at home, go to school, and engage with their family, friends, and communities.

151.     Parents of these children also want their children to live at home.

152.     These children and their parents would choose to receive services in their homes and communities instead of in segregated settings if they could access appropriate services and supports at home.

153.     Many children with behavioral health disabilities who are at serious risk of

entering institutions, who already live in the community, and their families would choose to continue receiving services in the community if Maine improves access to those services.

### Maine Could Serve Children with Behavioral Health Disabilities at Home Through Reasonable Modifications

154.    Maine can implement reasonable modifications so that children with behavioral health disabilities can live and thrive in integrated settings instead of entering institutions to access care.

155.    With reasonable modifications, children with behavioral health disabilities currently in institutions could transition to, and live successfully in, family and foster homes in the community.  Maine could make reasonable modifications to prevent the serious risk of segregation for numerous other Maine children with behavioral health disabilities.

156.    To start, Maine could ensure that children actually receive the community-based behavioral health services that the State offers in theory.

157.    Maine could also implement a process to determine each child's behavioral health service needs and ensure that families are informed of, and considered for, the MaineCare behavioral health services the child needs to avoid segregation or serious risk of segregation.

158.    Maine could address its long waitlists and ensure timely access to community-based services by expanding its capacity of community-based services, for example by providing additional support to community-based providers and expanding the direct care work force, including in rural and frontier areas.

159.    Maine could implement measures that would ensure that community-based behavioral health care providers are available to all eligible children at serious risk of unnecessary segregation.

160.    For example, Maine could implement a policy that would ensure that community-

based behavioral health care providers serve eligible children who are assigned to their caseload.

161.    Serving children with behavioral health disabilities in the community is a cost-effective alternative to segregation.

162.    The average cost per child of community-based services is equal to or less than the average cost per child of institutional services.

163.    When comparing average costs per child of Maine's behavioral health services, community-based services are among the least expensive services, while residential facilities are more expensive, and hospitals, emergency departments, and Long Creek are the most expensive.

164.    But instead of modifying its service system to prevent and resolve unnecessary segregation, Maine has prioritized expanding its institutional services.

165.    For example, Maine has committed to establishing one or more psychiatric residential treatment facilities for children—the first of their kind in Maine.

166.    But Maine has not committed to providing community-based services to the many children with behavioral health disabilities who are unnecessarily segregated or at serious risk of segregation.

## **VIOLATION OF TITLE II OF THE ADA, 42 U.S.C. §§ 12131–34**

167.    The United States repeats and incorporates by reference all the allegations set forth above.

168.    Defendant, the State of Maine, is a public entity that must comply with Title II of the ADA.  42 U.S.C. § 12131(1).

169.    Maine children with behavioral health disabilities who are segregated or at serious risk of segregation are persons with disabilities protected by Title II of the ADA, and they are qualified to participate in Maine's services, programs, and activities, including community-based

services.  *Id.* §§ 12102, 12131(2).

170.    Community-based services are appropriate for these children, many of whom, along with their parents or guardians, do not oppose community integration.

171.    Maine violates Title II of the ADA by administering its service system for children with behavioral health disabilities in a manner that fails to ensure that such children receive services in the most integrated setting appropriate to their needs.  *Id.* § 12132.

172.    Maine's actions constitute discrimination in violation of Title II of the ADA, *id.*, and its implementing regulation at 28 C.F.R. pt. 35.

173.    Maine could reasonably modify its programs and services to serve children in integrated settings.

174.    All conditions precedent to the filing of this Complaint have been satisfied.  Fed. R. Civ. P. 9(c); 28 C.F.R. pt. 35, subpt. F.

## REQUEST FOR RELIEF

The United States respectfully requests that the Court:

175.    Grant judgment in favor of the United States on its Complaint and declare that the State of Maine has violated Title II of the ADA, 42 U.S.C. §§ 12131–34, by failing to administer its services, programs, and activities for children with behavioral health disabilities in the most integrated setting appropriate to their needs.

176.    Enjoin the State of Maine to:

      a.    Cease discriminating against children with behavioral health disabilities, and instead provide them appropriate, integrated community-based services consistent with their individual needs, so that currently segregated children can transition to living at home, and to prevent children at serious

risk of unnecessary segregation from entering institutions; and

b.   Take steps as may be necessary to prevent the recurrence of any

discriminatory conduct in the future and to eliminate the effects of

Maine's unlawful conduct.

177.   Order other appropriate relief as the interests of justice may require.


**Dated:** September 9, 2024                    Respectfully submitted,

                                                KRISTEN CLARKE
                                                Assistant Attorney General

                                                REBECCA B. BOND
                                                Chief

                                                JENNIFER K. MCDANNELL
                                                Deputy Chief

                                                */s/ Victoria Thomas*
                                                VICTORIA THOMAS
                                                MARGARET GIRARD
                                                DANIELLE B. ROSENTHAL
                                                Trial Attorneys
                                                Disability Rights Section
                                                Civil Rights Division
                                                U.S. Department of Justice
                                                950 Pennsylvania Avenue, N.W.
                                                Washington, D.C. 20530
                                                Telephone: (202) 353-5137
                                                Facsimile: (202) 307-1197
                                                victoria.thomas@usdoj.gov

                                                *Counsel for Plaintiff United States of America*