# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.                            Case No. 1:24-cv-00315-SDN

**STATE OF MAINE,**

    Defendant.

## SETTLEMENT AGREEMENT BETWEEN
## THE UNITED STATES OF AMERICA AND
## THE STATE OF MAINE

## I.    INTRODUCTION

A.    This matter involves the services that the State of Maine (the "State") administers and delivers to children with behavioral health disabilities.

B.    As a result of complaints, including a September 17, 2019 complaint, on January 27, 2021, the United States Department of Justice (the "United States") opened an investigation under Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 et seq. and its implementing regulation, into the State's service system for children with behavioral health disabilities. Maine responded, providing information about its children's behavioral health services ("CBHS") system.

C.    On June 22, 2022, the United States issued a letter with its findings ("Letter of Findings") that the State does not comply with the integration mandate of Title II of the ADA. The State disputes the United States' findings. This Settlement Agreement (the "Agreement") resolves the United States' investigation of the State.

D.    The United States and the State (collectively, the "Parties") agree that it is in their interests, and the United States believes that it is in the public interest, to resolve this matter without litigation. The Parties have therefore voluntarily entered into this Agreement. In consideration of and through the terms of this Agreement, the Parties have agreed to address the issues that gave rise to the Letter of Findings and settle and fully resolve the claim in the United States' Complaint.

E.    The Parties are committed to full compliance with the ADA. This Agreement is intended to memorialize the commitment of the State to furnish its behavioral

health services, programs, and activities to children with a disability in the most integrated setting appropriate to meet their needs, as required by Title II of the ADA. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

F.      This Agreement is intended to prevent individuals with disabilities under the age of 21 with behavioral health needs from unnecessarily entering or remaining in an Out-of-Home Placement, and to support the transition of Children back to a Family Home if they have entered or remain in an Out-of-Home Placement unnecessarily. Implementation of this Agreement will strengthen the array of Community-Based Services available to Children, ensure Timely access to those services, and furnish to Children and their families service planning and Care Coordination. *See* 28 C.F.R. § 35.130(b)(7)(i). "Children" are defined at Section II. Community-Based Services," "Out-of-Home Placement," "Timely," "Family Home," "Care Coordination," and other terms used in this Agreement are defined in Appendix A: Definitions.

G.      Nothing in this Agreement is intended to require the parent, guardian, or legally responsible party of a Child ("Family" or "Families") or Child to accept services furnished by the State that they choose not to accept. 28 C.F.R. § 35.130(e)(1). Families and Children who choose not to accept a particular service under this Agreement will not be barred from receiving other services under this Agreement.

H.      Children will be assumed capable of having their needs met with a family, in a Family Home. A Family Home means an integrated, non-disability-specific setting in which Children live with a family who help the Child go to school, recreate, and receive services. A Family Home generally means a parental home. A Family Home also includes: (1) a kinship home, which is the home of an individual who is related to the Child by blood, marriage, or adoption; or who is a family friend whose close relationship is acknowledged by the Child's parents or by the Child; or who is unrelated to the Child but has an emotionally significant relationship with the Child or Child's Family; (2) a guardian's home; (3) a foster care home in which a foster care parent lives full-time; (4) a Therapeutic Foster Care Home (defined at Section IV.E.5), for Children in the child-welfare system; or Therapeutic Intensive Home (also defined at Section IV.E.5), for Children both in and out of the child-welfare system; or (5) a house or apartment owned or rented by the Child, if the Child has reached the age of majority or is an emancipated minor.

I.      The State will furnish all services this Agreement describes. The State will furnish these services in an individualized manner consistent with the preferences, goals, needs, and abilities of each Child and their Family. The State will provide information about the services and requirements in this Agreement in a manner that is accessible to Children, Families, and other Stakeholders, including those with limited English proficiency or with disabilities that impair their communication skills. *See* 28 C.F.R. § 35.160. "Stakeholders" is defined in Appendix A. The United States agrees and acknowledges that this Agreement is not, and is not to be construed as, an admission of liability on behalf of the State

2

or any of its agencies, subdivisions, officers, or employees, by whom liability is expressly denied. The Parties have entered into this Agreement for the sole purpose of avoiding the burden, expenses, delay, and uncertainties of litigation. The Parties understand that this Agreement resolves certain disputes between the Parties which, if pursued, would be contested, and that this Agreement will not be construed as a precedent, admission, or agreement concerning any factual or legal questions arising from the underlying dispute.

J.   Nothing in this Agreement will be construed to affect or limit the authority of: (1) Maine courts with respect to juvenile justice; or (2) the Maine Department of Corrections under Titles 15 and 34-A of the Maine Revised Statutes.

K.   The "Effective Date" of this Agreement will be the date on which the U.S. District Court for the District of Maine (the "Court") enters an order, under Federal Rule of Civil Procedure 41(a)(2), retaining jurisdiction to enforce this Agreement in accordance with its terms and for its duration, as set forth in Section XII. In the event the Court declines to do so, this Agreement shall become null and void and the United States will have the right to revive any claims that may be otherwise barred by operation of this Agreement.

L.   This Section I includes the goals of this Agreement. The Parties agree that the State's substantial compliance with Sections II to XV of the Agreement and its Appendices will satisfy the purposes and goals of this Agreement. The following sections of this Agreement will be interpreted consistent with the goals recited in this Section I.

## II.   CHILDREN COVERED BY THIS AGREEMENT

A.   The Children covered by this Agreement ("Child" or "Children") are individuals up to their 21st birthday who have Behavioral Health Disabilities and:

1.   Are eligible for, and, as applicable, are enrolled to receive behavioral health services offered, paid for, and/or administered by the Maine Department of Health and Human Services; and

2.   Are at serious risk of an Out-of-Home Placement, are in an Out-of-Home Placement, or have an Emergency Department Stay during the pendency of this Agreement.

"Behavioral Health Disabilities" and "Emergency Department Stay" are defined in Appendix A. The Children covered by this Agreement meet this paragraph and at least one of the categories defined in Sections II.B.1–4.

B.   The Children covered by this Agreement are those who meet the requirements of Section II.A and who also meet at least one of the following categories:

1.      Children who, up to one year prior to the Effective Date or at any point during the pendency of this Agreement, received behavioral health services in an Out-of-Home Placement or during an Emergency Department Stay;

2.      Children who, up to one year prior to the Effective Date, have been discharged from a Crisis Stabilization Unit (defined at Ch. 101, MaineCare Benefits Manual ("MBM"), Ch. II § 65.06-8.A), where they received behavioral health services;

3.      Children who, at any point during the pendency of this Agreement, have been referred to or are on the waitlist to receive behavioral health services in a Crisis Stabilization Unit, emergency department, or Out-of-Home Placement due to a behavioral health need; or

4.      Children who, at any point during the pendency of this Agreement, were detained in a Maine juvenile correctional facility pending adjudication or committed to such a facility post-adjudication pursuant to a criminal juvenile court order but have been released by the Maine Department of Corrections for placement outside that facility during the period of detention or commitment.

C.      The presence of a co-occurring disability (such as a physical disability or brain injury) will not exclude a Child from being covered by this Agreement.

D.      An Out-of-Home Placement is a setting other than a Family Home.  "Out-of-Home Placement" and other terms used in this Agreement are defined in Appendix A.

E.      Individuals under the age of 21 with behavioral health needs who are found not to be covered by this Agreement, and Children who are covered but then exit the population due to their failure to meet the criteria at Section II.A, will be referred and linked to other relevant services they may be eligible for as needed.

## III.   IDENTIFICATION OF STRENGTHS, NEEDS, AND SERVICES

A.      <u>Single Assessment</u>.

1.      Children who meet the criteria at Section III.A.3 will be offered a Single Assessment for all Medium or High Intensity Behavioral Health Services as of January 1, 2026. "Medium or High Intensity Behavioral Health Services" is defined in Appendix A.

2.      The Single Assessment will include, when feasible, review of the Child's diagnoses and current and former treatment records; an interview of the Child and the Child's Family; and an interview of the Child's current

and/or former service provider(s) and educator(s). The Single Assessment will:

    i. Include an instrument from the Level of Care Utilization System ("LOCUS") suite of instruments;

    ii. Determine the clinically-appropriate level of care and services needed to meet the Child's behavioral health needs; provided, however, that the service planning process and Child and Family Team, defined in Appendix A, determines the service setting;

    iii. Determine the Child's eligibility for High-Fidelity Wraparound Services ("HFW"), defined in Appendix A; and

    iv. Inform the service planning process described below.

3.     A Child will be offered a Single Assessment if:

    i. A Family requests assistance from a school, medical provider, clinician, crisis services provider, or responsible State employee to: (1) address a Child's behavioral health needs that would be appropriate for Medium or High Intensity Behavioral Health Services (regardless whether the Family uses the term "Medium or High Intensity Behavioral Health Services" or identifies a specific service); or (2) place their Child in an Out-of-Home Placement;

    ii. A school, medical provider, clinician, crisis services provider, or responsible State employee recommends that a Child be placed in an Out-of-Home Placement;

    iii. A Child has an Emergency Department Stay;

    iv. A Child has been arrested and referred to the Maine Department of Corrections pursuant to 15 M.R.S.A. § 3203-A; or

    v. A Child is admitted for in-patient psychiatric care.

4.     Absent emergency or other exigent circumstances, the Single Assessment will be the only assessment to determine a Child's eligibility for Medium or High Intensity Behavioral Health Services. Children periodically may be re-assessed by their provider or Care Coordinator to assure they are receiving appropriate services. Children can be reassessed through the Single Assessment at any time at the request of the Family, Child, or Care Coordinator. Where not otherwise specified, "Care Coordinator" is an umbrella term inclusive of "HFW Care Coordinators." Both "Care Coordinator" and "HFW Care Coordinator" are defined in Appendix A.

5.      The State will take appropriate steps so that schools, medical providers, clinicians (including emergency departments), crisis services providers, and responsible State employees refer Children for Single Assessments.

6.      For Children who meet the criteria in Section III.A.3 but who have had a recent Single Assessment and their needs have not changed, the State will furnish the Child with Care Coordination or require their existing Care Coordinator to take appropriate steps to address the Child's need for services.

B.      Service Planning – Care Coordination, including High-Fidelity Wraparound Services ("HFW").

1.      Care Coordination. All Children covered by this Agreement will have access to Care Coordination services guided by the Wraparound Planning Principles. Care Coordination is a service planning and coordination process provided to individuals under the age of 21 for selecting and organizing services that a Child may need to live in a Family Home, based on the Wraparound Planning Principles. Care Coordination includes but is not limited to HFW. The State will furnish the appropriate type of Care Coordination and Care Coordinator to all Children the Maine Department of Health and Human Services assesses to need Community-Based Services. "Wraparound Planning Principles" are defined in Appendix A.

2.      In crisis or urgent situations, the goal of service planning will be to stabilize the Child and divert the Child whenever possible from receiving services in an Out-of-Home Placement or making an emergency department visit due to a behavioral health need by identifying and furnishing appropriate Community-Based Services.

3.      Children will receive Care Coordination guided by the Wraparound Planning Principles effective as of January 1, 2027. The Wraparound Planning Principles, which are based on those established by the National Wraparound Initiative, are:

    i.   Family Voice and Choice;

    ii.  Family and Team Based;

    iii. Involvement of Natural Supports;

    iv.  Collaboration;

    v.   Community-Based;

    vi.  Culturally Competent;

    vii. Individualized;

       viii.  Strengths-Based;

       ix.  Persistence; and

       x.  Outcome-Based.

4. <u>High-Fidelity Wraparound Services ("HFW")</u>. HFW, to be offered effective as of the date set forth in the Implementation Plan, but no later than January 1, 2026, is an intensive, team-based type of Care Coordination. HFW is available to those Children receiving Behavioral Health Home ("BHH") services under MBM 10-144 C.M.R. ch. 101, for selecting and organizing the services that an eligible Child needs to address their behavioral health challenges when involved in multiple child-serving systems and at risk of or in an Out-of-Home Placement, based on the Wraparound Planning Principles. HFW is a structured approach to service planning for Children that encourages flexibility and creativity in determining how to meet the Child's behavioral health needs and is intended to offer individualized, coordinated, family-driven care to meet the complex needs of Children in need of Medium or High Intensity Children's Behavioral Health Services (and their Families) who are at risk of placement in, or while preparing for Community Return from, Out-of-Home Placements, and who may experience emotional, behavioral, safety, or mental health difficulties. "Community Return" is defined in Appendix A.

5. <u>Individualized Service Plan ("ISP")</u>. All Care Coordination will result in a written ISP that:

       i.  Identifies the Child's strengths, goals, needs, and desired outcomes;

       ii.  States the frequency and intensity of the services needed to address the Child's behavioral health needs, based on the individualized needs assessment; as well as: (1) whether the Child is authorized to receive each service (including the amount, duration, and frequency authorized); (2) whether the Child is actually receiving each service, whether the service is working effectively, and the name of the Community Provider(s) delivering or who will deliver each service; (3) whether there are any barriers to receiving a particular service, including any issues in terms of fulfilling all authorized hours of a particular service and if so, how those barriers will be addressed; and (4) whether adjustments are needed;

       iii.  Documents the Informed Choice, defined in Appendix A, as to service setting;

       iv.  Includes a crisis plan;

v.  Includes a Return Plan, defined in Appendix A and as explained in Section VIII, if the Child currently is receiving services in an Out-of-Home Placement;

vi.  Anticipates and appropriately plans for significant transitions in the Child's life, including a transition to a new school and the transition to adult services; and

vii.  References and coordinates with other written plans relevant to a Child's disability needs, such as an Individualized Education Plan, 504 Plan, Individualized Plan for Employment, behavioral health treatment plans, or positive behavioral support plans.

6.  <u>Child and Family Team</u>. A Child and Family Team is a group of people, chosen with the Child and Family and connected to them through natural, community, and formal support relationships, that develops and implements the ISP. The Child and Family Team includes the Child, the Family, Natural Supports chosen by the Child and Family, service providers, and, as appropriate, representatives of the Child's school and other community contacts. The Child and Family Team is led by a Care Coordinator.

7.  <u>Care Coordinator</u>. Care Coordinators support obtaining access for Children to Community-Based Services and have specialized knowledge and training in Care Coordination that is informed by the Wraparound Planning Principles, which are based on those developed by the National Wraparound Initiative. Care Coordinators, including but not limited to HFW Care Coordinators, deliver Care Coordination. "Care Coordinator" and "HFW Care Coordinator" are defined in Appendix A. Care Coordinators are responsible for:

i.  An individualized needs assessment to identify all necessary services to meet the Child's behavioral health needs;

ii.  This individualized needs assessment includes, at a minimum, a visit to the Child's home, as appropriate, observation of Family interactions, interviews with the Child, Family, and Natural Supports, and a detailed social history to identify behavioral health risk factors, child welfare involvement, and developmental trauma;

iii.  Meeting in places and at times convenient for and preferred by the Child and Family;

iv.  Utilizing the appropriate type of Care Coordination;

v.  Liaising and coordinating with the Child and Family Team and with Natural Supports to complete and implement an ISP that addresses all necessary Community-Based Services for the Child and enables the

Child to remain in or safely return to a Family Home based on the Informed Choice of a Family or Child;

vi. Planning to ensure services are received Timely, advocating for the Child and Family, and notifying the State if necessary services are not received Timely;

vii. A process to ensure that decisions can be made in the event that the Child and Family Team cannot reach consensus. The Child should be part of decision-making, unless clinically contraindicated;

viii. Coordinating with other relevant entities, including school staff, medical providers, juvenile justice staff, and other State service program staff or contractors to ensure those programs support the ISP and Community-Based Services provided;

ix. Identifying any risks leading to a potential Out-of-Home Placement or, for a Child in an Out-of-Home Placement, individual barriers to the Child living in a Family Home;

x. Meeting the following timelines:

a. Working with the Child and Family Team to develop an ISP within 30 days of the first meeting with the Care Coordinator; and

b. Working with the Child and Family Team to repeat the individualized needs assessment and review and update the ISP and its implementation on a regular basis, but not less than every six months. The re-assessment and review will be undertaken at the request of the Child and Family and after any significant change in circumstance, including but not limited to a crisis event, a hospitalization as a result of the Child's behavioral health needs, the Child's arrest and referral to the Maine Department of Corrections pursuant to 15 M.R.S.A. § 3203-A, an admission for in-patient psychiatric care, a child welfare placement, a placement in an alternative school, or an incident endangering self or others at the Child's school; and

xi. Ensuring that Children and Families understand how to raise issues with existing services or lack of services.

8. <u>Outcomes of the Service Planning Process</u>.

i. The Child and Family Team, through the service planning process, addresses the services identified for the Child and how those services would be furnished to the Child, subject to Section III.B.8.iii. The service planning process will include, as appropriate, discussion of how to furnish services in a Family Home other than a parental home,

such as a kinship home or a Therapeutic Intensive or Therapeutic Foster Care Home. Each Family and/or Child will, with the assistance of the Care Coordinator and the Child and Family Team, have the opportunity to make an Informed Choice whether the otherwise eligible Child will receive services in a Family Home, including a Family Home other than a parental home. If the Child is currently eligible for an Out-of-Home Placement, a Family and/or Child may make an Informed Choice for the Child to receive services in an Out-of-Home Placement. The Informed Choice will be documented in the ISP.

ii.   If the Family or Child chooses not to accept services in a Family Home, including in a Family Home other than a parental home, the refusal will be documented in the ISP. The ISP will include measures taken to afford the Family or Child with Informed Choice and address the Family or Child's concerns about the Child receiving services in a Family Home. Once a Family or Child's choice is documented, the Child and Family Team will reconvene at least annually to invite the Family and Child to re-engage with Care Coordination to furnish the Child with Community-Based Services. A Family or Child may change their mind and request Community-Based Services by contacting their Care Coordinator at any time.

iii.   In the event that, despite the assumption that Children can be served in a Family Home, the Child and Family Team determines that the Child needs one or more services that are currently only available in an Out-of-Home Placement, this will be documented in the ISP. The Care Coordinator will inform the Family and Child of the option to submit a request for a reasonable modification to the Maine Department of Health and Human Services' ADA Coordinator. The Family and/or Child may submit a reasonable modification request on their own; or may request the Care Coordinator to assist them or submit it on their behalf. The ADA Coordinator will follow the Maine Department of Health and Human Services' then existing reasonable modification process to determine whether reasonable modifications are necessary to furnish the Child with Community-Based Services.

iv.   If the ISP documents that a Family or Child has chosen not to accept services in a Family Home in accordance with Section III.B.8.i–ii, or the State has determined that necessary service(s) cannot be furnished to the Child in a Family Home through a reasonable modification in accordance with Section III.B.8.iii, then that Child will not count against the State for the purpose of the benchmarks and timelines required by this Agreement.

v.   Every six months of the Agreement's term, the State will report the number of Children whose ISPs state that (1) a Family or Child has

chosen not to accept services in a Family Home, or (2) the Child needs one or more services that cannot be provided in a Family Home through reasonable modifications.

vi. If, during any reporting period of the Agreement, more than 10% of all ISPs for Children include (1) a choice not to accept services in a Family Home and/or (2) a need for services that Maine only offers in an Out-of-Home Placement, then the Independent Reviewer will review ISPs that include such choice or need for Out-of-Home Placement and may interview Families, Children, Care Coordinators, providers, treating professionals, and Natural Supports. The Independent Reviewer will provide technical assistance to the State about its service planning and reasonable modification processes each reporting period that this 10% threshold is exceeded. The goal of this technical assistance is to ensure that the State is: (1) proceeding from the assumption that Children can be served in a Family Home; (2) providing all Families and Children with the opportunity to make an Informed Choice; and (3) making reasonable modifications consistent with Section III.B.8.iii to serve Children in Family Homes.

vii. The Independent Reviewer will repeat the review described in Section III.B.8.vi annually. The Independent Reviewer will provide continued technical assistance so long as the 10% threshold is exceeded, until Children receive services in a Family Home in all circumstances except: (1) where a Family or Child has chosen not to accept services in a Family Home; or (2) in the event that a Child's service needs cannot be met in a Family Home through reasonable modifications.

viii. Notwithstanding Sections III.B.8.v–vii above: (1) the fact that the 10% threshold is exceeded; and/or (2) the extent of the State's compliance with technical assistance offered by the Independent Reviewer, alone, is insufficient to establish non-compliance with this Agreement.

## IV.   COMMUNITY-BASED SERVICES

A.   <u>Array, Intensity, and Duration</u>. The State will include all services listed here in Section IV in its full array of Community-Based Services. The State will ensure that Children have access to the full array and intensity of Community-Based Services for which they are authorized.

1.   Specific services must continue for as long as the Child remains eligible and the service continues to be included in the Child's ISP. In other words, there will not be automatic termination dates or calendar limitations on services.

2.   Children will not be excluded from or denied Community-Based Services due to: (a) complex behavioral health needs; (b) significant physical or

medical needs in addition to behavioral health needs; or (c) the need for behavioral health assistance for up to 24 hours per day.

B.   <u>Statewide Availability</u>. The State will develop and ensure sufficient statewide availability of the services listed here in Section IV.

C.   <u>Timeliness</u>. The State will furnish Community-Based Services that Children need in a Timely manner. To be Timely, services must be available in time to prevent Children from unnecessarily: (1) entering an Out-of-Home Placement for the purpose of receiving behavioral health services; (2) remaining in an Out-of-Home Placement; or (3) having an Emergency Department Stay. For purposes of Timeliness, a Child "unnecessarily" enters or remains in an Out-of-Home Placement when the Child and/or Family are eligible for Home and Community-Based Services and are awaiting the start of such services and the delay is the primary reason the Child enters or remains in an Out-of-Home Placement. For purpose of Timeliness, a Child "unnecessarily" remains in an emergency department when the stay extends because of the Childs's unmet behavioral health needs. "Timely" is defined in Appendix A.

D.   <u>Crisis Services</u>. The State will include the following components in its statewide crisis response system:

   1.   A 24/7 crisis hotline staffed with trained workers who are able to communicate with children experiencing crisis and appropriately dispatch mobile crisis intervention teams for face-to-face response as needed. The crisis hotline will assist with immediate stabilization. For all in-person responses, either the crisis hotline or a member of the mobile crisis intervention team will be available to provide telehealth stabilization support as needed to Children and their Families during the mobile crisis intervention travel time; and

   2.   Stand-alone mobile crisis intervention services. Mobile crisis services will serve Children who are in crisis, employing a team-based mobile response for Children experiencing a mental health or substance use crisis, including both clinical and para-professional staff available, statewide, to promptly respond to and help resolve crises, consistent with Section IX.H.4.

E.   <u>Intensive In-Home Behavioral Treatment Services</u>. The State will ensure statewide availability of MaineCare intensive in-home behavioral treatment services, including (without limitation) Section 65 Home and Community Based Treatment ("HCT"), and Section 28 Rehabilitative and Community Supports for Children with Cognitive Impairment and Functional Limitations ("RCS"). All Children must be considered for intensive in-home behavioral treatment services through the Single Assessment, and, if eligible, offered those services during the service planning process. The Child and Family Team will, through the service planning process, determine the combination and intensity of services that will

best meet the Child's needs. Intensive in-home behavioral treatment services include:

1.   Behavioral Services. Behavioral services address challenging behaviors that interfere with a Child's functioning. Behavioral services also educate the Child's family about, and train the family in managing, the Child's behavioral health disability. A qualified paraprofessional under appropriate supervision, including clinical supervision, as required by the model of treatment, will assist the family and Child in implementing the behavioral interventions. Behavioral services include:

    i.   Implementation of skill-based interventions for the remediation of behaviors or improvement of symptoms, including the implementation of a positive behavior plan and modeling interventions for the Child's family for the benefit of the Child to assist them in implementing the strategies;

    ii.   Development of functional skills to improve self-care, self-regulation, or other functional impairments by intervening to decrease or replace non-functional behavior that interferes with daily living tasks;

    iii.   Family psychoeducation of the Child and their family about how to manage the Child's behavioral health symptoms; and

    iv.   Support to address behaviors that interfere with the achievement of a stable and permanent family life and educational objectives in an academic program in the community.

2.   Therapy Services. Therapy services help to ameliorate the Child's behavioral health symptoms and strengthen family structures and supports. Therapy services are situational, working with the Child and family for the benefit of the Child, preferably in their natural environment, to foster understanding of family dynamics and teach strategies to address stressors as they arise. Therapy services will improve the family's capacity to improve the Child's functioning in the home and community. Licensed therapists or otherwise certified therapists practicing under supervision of a licensed clinician will provide intensive individual and family therapy as clinically indicated. Qualified paraprofessionals working under the supervision of the licensed or certified therapist will assist the Child and family in achieving the therapy goals set by the Child and Family Team and the licensed or certified therapist.

3.   Family and Youth Peer Services. Family and youth peer services include developing and linking Family and Children with peers who have personally faced the challenges of coping with behavioral health disabilities, either as a person with a behavioral health disability or as a caregiver. Peer services are family centered and help families develop

skills in managing and coping with behavioral health disabilities, become self-advocates, and identify and use Natural Supports. These services will enhance community living skills, community integration, rehabilitation, resiliency, and recovery. Peer services will be provided one-on-one, either parent-to-parent or youth-to-youth. The State will maximize the use of peer services in accomplishing the goals of this Agreement.

4.    <u>Family Supports</u>. Services that assist and support Children's families and Natural Supports in their role as caregivers, including respite and family psychoeducation of the Child and their family about how to manage the Child's behavioral health symptoms, and family peer supports offered under BHH.

5.    <u>Therapeutic Foster Care Homes and Therapeutic Intensive Homes</u>. Services provided to Children that meet the requirements of 22 M.R.S. § 8101(5). A Therapeutic Foster Care Home is a foster care home for children in the child-welfare system in which a specially trained parent lives full-time. A Therapeutic Intensive Home is also referred to in Maine statute or rule as "Treatment Foster Care," "Specialized Treatment Foster Homes," and "Specialized Children's Home." A Therapeutic Intensive Home is a Family Home for Children either in or outside of the child-welfare system who need to live with a specially trained parent. The specially trained parent lives in the Therapeutic Intensive Home full-time.

6.    <u>Individual Planning Funds</u>. Individual Planning Funds are designed to provide flexible, short-term, and time-limited support to fill in gaps in services that cannot be addressed through any other funding source, for example to help the Child transition to a new service. The State will prioritize the use of Individual Planning Funds for the purpose of ensuring that Children are able to remain in or return to a Family Home. Care Coordinators will help Children access Individual Planning Funds for this purpose.

## V.    OUTREACH, ENGAGEMENT, AND INTERAGENCY COORDINATION

A.    <u>Outreach and Engagement About Community-Based Services</u>.

1.    <u>Outreach Materials</u>. Within six months of the Effective Date, the State will publish and effectively provide information for Families, Children, and other Stakeholders about Community-Based Services, how to access them, and the rights of Children under this Agreement. The State will ensure that it uses a variety of publication methods, including print and digital publications and social media, to reach Families, Children, and other Stakeholders. The State will update this information as needed and disseminate it to appropriate State agencies and Stakeholders. These materials will describe the various Community-Based Services available to Children, including how to request a Single Assessment for a Child.

14

These materials will direct Children, Families, and the public to the State's website and include a phone number to call for additional information.

2.   Outreach. Within six months of the Effective Date, the State will begin providing outreach to Families, Children, and other Stakeholders about Community-Based Services, how to access them, and the rights of Children under this Agreement.

    i.   For the first two years that this Agreement is in effect, the State will provide at least six outreach events in varied geographic regions of the State, in places and at times likely to be convenient for Families, Children, and Stakeholders, as detailed in the Implementation Plan.

    ii.  For each year that this Agreement is in effect after the first two years, the State will provide at least three outreach events in varied geographic regions of the State, in places and at times likely to be convenient for Families, Children, and Stakeholders.

    iii. For each year that this Agreement is in effect, the State will leverage existing, relevant outreach programs, committees, commissions, events, and meetings to communicate relevant information about Community-Based Services, how to access them, and the rights of Children under this Agreement, including to juvenile justice entities.

    iv.  The State will track and, upon request, report on the number and types of attendees at each event (e.g., Families, Community Providers, etc.), to the extent such attendees choose to disclose their affiliations or roles.

B.   Interagency Cooperation. The State will take steps to ensure interagency cooperation among the Maine Department of Health and Human Services (including the Office of Behavioral Health, the Office of Child and Family Services, and the Office of MaineCare Services), the Maine Department of Corrections, and the Maine Department of Education to accomplish the requirements of this Agreement. This collaboration may include: allocation of responsibility, funding commitments, and authority for conducting and ensuring the quality of all efforts to meet requirements of this Agreement, including the provision of Community-Based Services; outreach; Community Provider training and sufficiency; Community Return; ensuring quality services; and data collection, sharing, and reporting.

## VI.   COMMUNITY PROVIDER SUFFICIENCY AND TRAINING

A.   Match Children with Community Providers. The State will furnish Timely access to Community-Based Services by providing real-time information to Children and their Families and Care Coordinators about the location and types of services in their search area, which Community Providers have immediate availability, and

how to contact Community Providers to secure Community-Based Services for the Child. The State will continue to onboard Community Providers to its provider directory(ies), train providers to utilize the directory(ies), and promote the provider directory(ies) to community members.

B.    <u>Skilled Community Provider Workforce Recruitment</u>. The State will take immediate steps to review, develop, implement, and update a plan to address any current or future workforce shortages of Community Providers, including Therapeutic Intensive Home parents and Therapeutic Foster Care Home parents. The State will make reasonable modifications to ensure that the number and quality of Community Providers are sufficient to enable Children to remain in, or successfully transition back to, Family Homes with necessary Community-Based Services, if consistent with their ISPs, and to have long-term stability in Family Homes throughout the State.

C.    <u>Skilled Community Provider Workforce Training</u>. The State shall redesign its curriculum for training behavioral health professionals ("BHPs"), mental health and rehabilitation technicians ("MHRTs"), and other select Community Providers, to streamline upskilling and allow "stackable" credits as workers advance their training and certification levels. The State, through a contracted vendor, shall make such training available at no cost to appropriate individuals seeking to become Community Providers. In developing and expanding the availability of no cost training opportunities for such Community Providers, the State shall partner with provider agencies, make training opportunities available statewide, and reduce barriers to accessing training.

D.    <u>Rulemaking</u>. The State will amend its rules governing MaineCare Community Providers to specifically describe performance expectations, and desired outcomes and ensure provider accountability for the Timeliness of services described in this Agreement.

E.    <u>Provider Flexibility and Contingency Planning</u>. The State will ensure its rules and processes allow multiple Community Providers to be authorized to serve a Child where no one Community Provider is able to fully meet the Child's assessed need. The State will ensure that Community Providers deliver Community-Based Services with sufficient flexibility to address fluctuations in: (a) a Child's needs; or (b) a Community Provider's availability. Within one year of the Effective Date, the State will require Community Providers to develop contingency plans so that Children have access to back-up Community Providers and receive all authorized Community-Based Services on days when an individual Community Provider is unavailable. The State will provide support to Community Providers in developing contingency plans and will ensure the contingency plans are shared with the Child and Family Teams.

F.    <u>Support for Self-Direction</u>. The State will support Children and Families who self-direct Community-Based Services and support the use of telehealth, as

appropriate. Regardless of self-direction, all Children will be offered a Care Coordinator.

G. <u>Reporting</u>. As part of its Implementation Plan (Section IX.B), Data Collection and Analysis Plan (Section IX.B.4), the State will report to the United States and Independent Reviewer semi-annually with reporting and data on workforce shortages affecting services required under this Agreement, steps the State has taken to increase the workforce, and whether those steps have enabled the State to furnish Care Coordination and Community-Based Services to Children, as required by Sections III and IV.

H. <u>Communication with Provider Network</u>.

    1. <u>Communication</u>. The State will communicate with Community Providers and providers of Children's behavioral health services in Out-of-Home Placements, on issues related to implementation of this Agreement, including: (a) working with Community Providers to ensure Community Providers connect Children and Families to appropriate resources, including Single Assessments; (b) engaging Community Providers and providers of Children's behavioral health services in Out-of-Home Placements so that the State learns about any challenges in offering the services described in this Agreement; (c) soliciting feedback on proposed policy changes consistent with the Maine Administrative Procedure Act; and (d) offering technical assistance related to State policies, billing, and service development.

    2. <u>Quarterly Meetings</u>. Beginning no later than three months after the Effective Date, the State will hold meetings at least quarterly with Community Providers and Out-of-Home Placement service providers to discuss issues related to State policies, reimbursement, billing, and service provision, and to gather feedback on issues such as providing services consistent with this Agreement, addressing unmet needs, and training staff. These meetings may include topics unrelated to this Agreement.

I. <u>Training</u>.

    1. Within 14 months of the Effective Date, the Maine Department of Health and Human Services will implement training policies and mandatory, competency-based curricula to ensure Community Providers and Care Coordinators are trained in evidence-based practices sufficient to provide the services required under this Agreement pursuant to the curricula and certification processes for those evidence-based practices. The training policies and curricula will meet the requirements set forth at Appendix C: Training.

2.      Within one year of the Effective Date, the State will provide joint specialized training on Care Coordination according to the Wraparound Planning Principles to all juvenile community corrections officers.

## VII.   FUNDING

A.      The State will establish MaineCare provider reimbursement rates, pursuant to 22 M.R.S. § 3173-J, that reimburse Community Providers for the costs of providing Community-Based Services to enable Children to return to or remain in a Family Home long-term.

B.      The State will provide annual cost-of-living adjustments for Community-Based Services and conduct rate determinations at least every five years for Assertive Community Treatment ("ACT") and HCT services, consistent with 22 M.R.S. § 3173-J.

## VIII.   RETURN FROM OUT-OF-HOME PLACEMENTS TO THE FAMILY HOME

A.      Return Plan. When the Child and Family Team decides that, with planning and services, a Child in an Out-of-Home Placement can return to a Family Home, the Care Coordinator will work with the Child and Family Team to develop a Return Plan. The Return Plan is part of the ISP and lists the specific steps that will be taken so the Child can return to a Family Home and continue to receive necessary services. The Child and Family Team sets a planned discharge date in the Return Plan.

B.      Community Return. Community Return is the successful process of discharging a Child from an Out-of-Home Placement to a Family Home and furnishing Timely Community-Based Services accepted by the Child and/or their Family to maintain the Child in a Family Home long-term. Preparation for Community Return begins on a Child's first day in an Out-of-Home Placement.

C.      Assignment of Care Coordinators. The State will furnish Care Coordination to all Children, both in in- and out-of-State Out-of-Home Placements. Care Coordinators will facilitate Community Return for each Child in an Out-of-Home Placement, working directly with the Child and Family Team.

D.      Pursuant to 14-472 C.M.R. ch. 1, the State will review complaints that are not requests for a reasonable modification from Children, Family, or Care Coordinators and make all reasonable efforts to resolve barriers identified in the complaints.

E.      The State will seek, through Timely Community-Based Services, to prevent each Child who achieves Community Return from unnecessarily (1) having an Emergency Department Stay or (2) entering or remaining in in an Out-of-Home Placement. For purposes of this paragraph, "unnecessarily" has the same meaning as in Section IV.C and the definition of "Timely" in Appendix A.

## IX.    IMPLEMENTATION

A.    <u>Children's Behavioral Services Integration Coordinator</u>. Within 120 days of the
Effective Date, the State will appoint or hire a Children's Behavioral Services
Integration Coordinator ("Coordinator"). The Coordinator will: (1) coordinate the
State's efforts to comply with the terms of this Agreement; (2) have sufficient
authority to direct State staff to the extent necessary to implement the terms of
this Agreement; (3) have experience in program management, program
implementation, and tracking of program implementation; and (4) coordinate the
State's Agreement-related activities and its communications with the United
States and the Independent Reviewer. The role of the Independent Reviewer is
defined at Section XI. The State's Implementation Plan (Section IX.B) will
address the responsibilities and role of the Coordinator. If the Coordinator
position becomes vacant for any reason, the State will appoint or hire a
replacement as soon as possible.

B.    <u>Implementation Plan</u>. Immediately after the Effective Date, the State will begin
developing an Implementation Plan due to the United States within 120 days of
the Effective Date or within 1 week of the retention of the Independent Reviewer,
whichever is later, to be updated and resubmitted at least 6 months before the end
of the second full State fiscal year within the Agreement's term, and at least
biennially thereafter. The Implementation Plan will:

1.    Assign to the relevant State offices or employees responsibility for
achieving each initiative and timeline until the development and
submission of the next Implementation Plan update;

2.    Establish clear strategies to achieve Agreement initiatives and outcomes;

3.    Describe evaluation metrics and methods for each proposed strategy to
assess efficacy and effectiveness;

4.    Include a Data Collection and Analysis Plan to measure progress and
completion of Agreement initiatives and outcomes. The plan will create a
data collection and analysis system that:

i.    Records and maintains data on Children covered by this Agreement
and numeric requirements of this Agreement to enable the Parties and
Independent Reviewer to analyze data to measure whether Agreement
outcomes are being achieved. The data will be available on both an
aggregate and individual basis. The Parties will jointly seek a
confidentiality order from the Court so that individually identifiable
data will be made available to the United States pursuant to the
confidentiality order.  The State will provide the Independent
Reviewer full access to personally identifiable or confidential
information related to this Agreement and so need not be limited by
the confidentiality order. The Data Collection and Analysis Plan will

19

enable the State to, beginning within one year of the Effective Date, produce the data to the Independent Reviewer and the United States annually;

    ii.   Collects and analyzes valid, reliable, trustworthy, and credible quantitative and qualitative data relevant to assessing compliance with this Agreement;

    iii.   Enables identification of trends, patterns, strengths, barriers, and problems at the individual, provider, and system levels, including, but not limited to, service gaps, accessibility of services, serving individuals with significant or complex needs, the discharge and transition processes; and provision of Community-Based Services to maintain Children in Family Homes long-term; and

    iv.   Meets the Minimum Data Elements found at Appendix B: Minimum Data Elements.

5.    Outline the reasonable modifications the State will make consistent with 28 C.F.R. § 35.130(b)(7), as described in Section III.B.8.iii;

6.    Consider offering therapies that are recommended for Children with developmental trauma; and

7.    State the date that each of the services described in this Agreement reasonably are expected to be implemented.

C.    <u>Biennial Updates to the Implementation Plan</u>. At least six months before the end of the second full State fiscal year within the Agreement's term, and at least biennially thereafter, the State will update the Implementation Plan. The State may consult with the United States or the Independent Reviewer. These updates to the Implementation Plan will focus on implementation for the upcoming two State fiscal years, including:

1.    Assigning to the relevant State offices or employees responsibility for achieving each initiative and a timeline for the relevant time-period;

2.    Challenges encountered by the State to date and strategies to resolve them;

3.    Refinement of previous strategies or development of new strategies to achieve Agreement initiatives and outcomes; and

4.    Development of preventative, corrective, and improvement data collection and analysis to identify and address identified challenges, and to build on successes and positive outcomes.

D.    <u>Consultative Process and Approval</u>. Within 120 days of the Effective Date, or within 1 week of the retention of the Independent Reviewer, whichever is later,

the State will present to the United States and the Independent Reviewer its completed Implementation Plan. Within 30 days of receipt, the United States and the Independent Reviewer will provide comments to the State regarding the Implementation Plan. Within 30 days of receiving comments, the State will promptly revise its Implementation Plan to address comments from the United States and the Independent Reviewer that the State concludes are reasonably necessary to assure compliance with this Agreement. The Parties will meet and consult as necessary. The State must continue to revise its Implementation Plan until the United States approves it, provided however that the State cannot be required to include in the Implementation Plan any undertaking that is inconsistent with this Agreement or, where relevant, the Medicaid Act.

E.    <u>Publication</u>. The State will make the Implementation Plan and biennial updates publicly available by posting them on the State's website and relevant social media accounts.

F.    <u>Outreach</u>. The State will seek insight into the needs of Children and their Families and receive feedback on the State's progress in strengthening the array and Timeliness of Community-Based Services through the State's engagement with various Stakeholders, including: quarterly meetings with Disability Rights Maine; quarterly meetings with all CBHS providers; bi-monthly provider meetings on the Continuum of Care with the Child and Family Network; monthly discussions with the System of Care Steering Committee; monthly meetings of the Juvenile Justice Advisory Group; monthly discussions with the Quality Improvement Committee; quarterly working groups with BHH and Opioid Health Home providers; regular meetings of the MaineCare Advisory Committee; and discussions regarding the development of Certified Community Behavioral Health Clinics. The State will continue to seek such insight and feedback throughout the duration of this Agreement and may also seek such insight and feedback during the outreach and communications described in Sections V(A) and VI(H).

G.    <u>Juvenile Justice Transitions and Reporting</u>.

1.    The State will transition Children, if appropriate and eligible, out of a Maine juvenile correctional facility in accordance with the requirements of the Maine juvenile court and Titles 15 and 34-A of the Maine Revised Statutes. For Children committed to a Maine juvenile correctional facility, the State shall begin community reintegration planning at the point of admission. The case plan of each committed Child shall include whether community reintegration is appropriate and, if so, steps to be taken toward community reintegration.

2.    Beginning six months after the Effective Date, and every six months thereafter, the State shall provide the United States: (1) de-identified copies of written periodic review reports of juvenile dispositions created in the prior six months pursuant to 15 M.R.S. § 3315; (2) a de-identified list of juveniles detained for more than 30 days at a Maine juvenile

correctional facility, including information on whether the Maine State District Court has provided the Maine Department of Corrections with discretion to release the juvenile; and (3) a de-identified list of juveniles committed to the custody of the Maine Department of Corrections, including information on the status of those community release efforts. The State will provide the Independent Reviewer access to the personally identifiable or confidential information in the documents referred to in this paragraph.

H.     Implementation Timelines. The State's Implementation Plan and biennial updates will address how it will meet, in addition to benchmarks and timelines found throughout this Agreement and its Appendices, the following required benchmarks and timelines:

1.     Care Coordination Timelines.

   i.   No later than January 1, 2026, the State will furnish HFW and HFW Care Coordinators to Children meeting clinical criteria through the Single Assessment as described in this Agreement.

   ii.  No later than January 1, 2026, the State will train 50% of Care Coordinators in the Wraparound Planning Principles.

   iii. No later than January 1, 2027, the State will train all Care Coordinators in the Wraparound Planning Principles and furnish Care Coordinators and Care Coordination to all Children as described in this Agreement.

   iv.  The State will continue thereafter to provide training in the Wrap Around Planning Principles annually to Care Coordinators.

   v.   The State will continue thereafter to furnish to all Children Care Coordination that meets the requirements of this Agreement and as determined by the Child's needs.

2.     Single Assessment Benchmarks.

   i.   No later than January 1, 2026, 50% of Children who receive a Single Assessment and engage in Care Coordination will have an ISP that meets the requirements at Section III.B.5 within 30 days of their first meeting with their Care Coordinator.

   ii.  No later than January 1, 2027, all Children who receive a Single Assessment and engage in Care Coordination will have an ISP that meets the requirements at Section III.B.5 within 30 days of their first meeting with their Care Coordinator.

3.    <u>HFW Ratios</u>. Each HFW Care Coordinator will work with small numbers of Children and their respective Child and Family Teams, as specified by the ratios below. If an HFW Care Coordinator serves additional individuals other than Children covered by this Agreement, the ratio still applies to the HFW Care Coordinator's total caseload of individuals served. Children will be offered HFW with a ratio of one HFW Care Coordinator to no more than 10 Children, and will count towards the benchmarks and timelines below. If State law or policy for HFW requires a smaller ratio than listed below, that smaller ratio must apply.

    i.   By January 1, 2026, 30% of eligible Children will be provided HFW with a ratio of 1 HFW Care Coordinator to no more than 10 Children.

    ii.   By January 1, 2027, 60% of eligible Children will be provided HFW with a ratio of 1 HFW Care Coordinator to no more than 10 Children.

    iii.   By January 1, 2028, 90% of eligible Children will be provided HFW with a ratio of 1 HFW Care Coordinator to no more than 10 Children.

    iv.   By July 1, 2028, all eligible Children will be provided HFW with a ratio of 1 HFW Care Coordinator to no more than 10 Children.

4.    <u>Community-Based Services Benchmarks and Timelines</u>.

    i.   Within three months after the Effective Date, the State will submit a State Plan Amendment to CMS to implement the CMS-qualifying mobile crisis service. Upon CMS approval of a State Plan Amendment and the Maine Department of Health and Human Services adopting rules implementing the CMS qualifying mobile crisis service, 50% of face-to-face mobile crisis intervention team responses will occur within 120 minutes in rural settings, and 60 minutes in urban settings; and

    ii.   Within 3 years of the Effective Date, 95% of face-to-face mobile crisis intervention team responses will occur within 120 minutes in rural settings, and 60 minutes in urban settings.

5.    <u>Community Return Benchmarks and Timelines</u>.

    i.   Within 1 year of the Effective Date, the State will accomplish Community Returns for a total of 40 Children in an Out-of-Home Placement whose ISP/Return Plan states that Community Return is a goal according to the processes at Section III.B.8;

    ii.   Within 2 years of the Effective Date, the State will accomplish Community Returns for an additional 55 Children in an Out-of-Home Placement, whose ISP/Return Plan states that Community Return is a

goal according to the processes at Section III.B.8, for a total of 95 Community Transitions;

iii.   Within 3 years of the Effective Date, the State will accomplish Community Returns for an additional 70 Children in an Out-of-Home Placement whose ISP/Return Plan states that Community Return is a goal according to the processes at Section III.B.8, for a total of 165 Community Transitions;

iv.   Within 4 years of the Effective Date, the State will accomplish Community Returns for 80% of Children in an Out-of-Home Placement whose ISP/Return Plan states that Community Return is a goal according to the processes at Section III.B.8; and

v.   Within 5 years of the Effective Date and thereafter, the State will accomplish Community Returns for 92% of Children in an Out-of-Home Placement whose ISP/Return Plan states that Community Return is a goal according to the processes at Section III.B.8. Such Community Returns will occur on or within 30 days of the date identified in the ISP/Return Plan for discharge.

vi.   Each Child the State transitions from an Out-of-Home Placement may only be counted for the purposes of the benchmarks to accomplish Community Returns so long as they live in a Family Home. A previously returned Child will no longer count towards the benchmarks if they reenter an Out-of-Home Placement during the pendency of this Agreement, but will count once more if and when they achieve Community Return again.

vii.   The State will track Children who achieve Community Returns but who later enter an emergency department related to a behavioral health need, or re-enter an Out-of-Home Placement. The State will analyze available data to determine contributing factors and take steps to prevent future unnecessary Emergency Department Stays and re-entry to Out-of-Home Placements.

## X.   ENSURING QUALITY SERVICES

A.   The State will assess the adequacy of each Community Provider agency's services in terms of quality (e.g., the services are provided with fidelity to the relevant service, with appropriate training and safety protocols in place) and quantity (e.g., the total amount of authorized services are fulfilled, and appropriate steps are taken to ensure backup staff in the event of a staff member's absence).

B.   Beginning 180 days after the Effective Date, the State will annually assess at least 10% of Community Provider agencies in each category of services described in Section IV. Where only one Community Provider agency offers a particular

category of services and the State does not have concerns regarding that agency's performance, an assessment of adequacy of that agency's services shall not be required in consecutive years. If the assessment reveals that a Community Provider agency's services are inadequate, then the State will give the agency technical assistance, and, when appropriate, ensure that the agency remediates the inadequacy.

C.      The State will coordinate the annual assessments of Community Provider agencies under this section with other applicable licensing activities of the Maine Department of Health and Human Services and will consider recent licensing reviews in prioritizing Community Provider agencies for annual assessment.

## XI.    INDEPENDENT REVIEWER

A.      <u>Selection of the Independent Reviewer</u>.

1.      <u>Independent Reviewer</u>. The Parties will select an Independent Reviewer within four months of the Effective Date. The State will use its request for proposal ("RFP") process. The RFP will be mutually developed by the Parties to comply with the State's competitive bidding process and the United States' process for selecting an independent reviewer. The RFP will specify the criteria for selecting the Independent Reviewer. Those criteria will include that the Independent Reviewer must have expertise and experience in the provision of Home and Community-Based Services for children with Behavioral Health Disabilities, including facilitating and overseeing: (1) administration, funding, and delivery of such services; and (2) transitions to Community-Based Services from Out-of-Home Placements. The United States will participate in review and evaluation of the RFP and applications for the Independent Reviewer. Both Parties must agree on which applicant will be selected pursuant to the RFP process. The initial term of the contract with the Independent Reviewer will be three years, which will be renewed for the remainder of the duration of the Agreement unless or until the Independent Reviewer resigns or the Parties agree not to renew. If the Independent Reviewer resigns or the Parties agree not to renew, the Parties will replace the Independent Reviewer.

2.      <u>Replacement of the Independent Reviewer</u>. If the Independent Reviewer resigns or their contract is terminated or not renewed, then the Parties will jointly select a new Independent Reviewer within four months of the prior Independent Reviewer's last day, in conformance with Section XI.A.1.

B.      <u>Independent Reviewer's Powers and Responsibilities</u>.

1.      <u>Independent Reviewer's Role</u>. Throughout the term of this Agreement, the Independent Reviewer will gather, analyze, and report on information and data reflecting the State's progress in complying with all sections of this Agreement. The Independent Reviewer will pursue a problem-solving

approach to resolve amicably any disagreements that arise between the Parties so the Parties can focus on the State's compliance with the Agreement.

2.  <u>Assessment Methodology Plan</u>. The Independent Reviewer will consult with the Parties and submit to them a written plan on the methodologies the Independent Reviewer will use to assess compliance with and implementation of the Agreement. The Parties will provide the Independent Reviewer with any comments on the plan before its implementation. The Independent Reviewer's methodologies will include on-site inspection of Children's residences and programs; detailed review of relevant documents, records, and data collected by the State and behavioral health service providers, including ISPs; may include interviews with Families, Children, school administrators, providers, Natural Supports, Care Coordinators, Stakeholders, and relevant State staff; individual case reviews, including the quality and sufficiency of ISPs, by regularly reviewing sufficient samples of Children, including through first-person interviews; and other methodologies as agreed to by the Parties. The plan will also identify data elements the Independent Reviewer will request from the State.

C.  <u>Written Annual Reports</u>. The Independent Reviewer, in every fiscal year within the term of this Agreement, will submit to the Parties a comprehensive public report on the State's compliance with the terms of the Agreement during the preceding State fiscal year. Additionally, nine months prior to the date that the Agreement is otherwise intended to terminate, the Independent Reviewer will prepare a final report on compliance. These reports must include recommendations for facilitating or sustaining compliance. The reports must specify how the State is or is not in compliance with each of its obligations in the Agreement; for future obligations in the Agreement, the Independent Reviewer will report on whether the State is progressing at an appropriate pace toward achieving compliance when the obligation takes effect. These reports may contain personally identifiable or confidential information when provided to the Parties. Such information will be redacted from the public version of the reports. At least 45 days before finalizing any of these reports, the Independent Reviewer must provide a draft of the report to the Parties for comment. The Parties have 30 days to comment, and the Independent Reviewer has 15 days to finalize the report after receiving comments from both Parties. After the Independent Reviewer submits a report to the Parties, the State shall publish the public version of the report on its website. The finalization or publishing of any report shall not constitute agreement by a Party to its contents or conclusions.

D.  <u>Technical Assistance</u>. The Independent Reviewer may provide the State with technical assistance relating to any aspect of this Agreement.

E.  <u>Impact of Technical Assistance on Compliance</u>. The State's implementation or non-implementation of the technical assistance of the Independent Reviewer, as

documented in the Independent Reviewer's reporting, will be a factor in evaluating non-compliance with this Agreement, but is insufficient to establish non-compliance.

F.   <u>Independent Reviewer's Authority</u>. In completing these responsibilities, the Independent Reviewer may:

1.   Hire staff and consultants as necessary to assist in carrying out the Independent Reviewer's duties and responsibilities.

2.   Require the State and its behavioral health service providers to produce records and data, including Children's individual patient or client files to which the State has access, as requested, pursuant to the confidentiality order, per Section IX.B.4.i.

3.   Enter, with or without advance notice, any part of any Out-of-Home Placement or program providing services to Children and interview individuals with knowledge pertinent to compliance with this Agreement. Staff and consultants of the Independent Reviewer must also have this authority. The State will facilitate the Independent Reviewer's access if an Out-of-Home Placement or program denies entry.

4.   Communicate *ex parte* with a Party, counsel, agents or staff of the Parties, or anyone else the Independent Reviewer deems necessary for completing their responsibilities. The State may require that the Independent Reviewer copy its counsel on any written communications with any responsible State employees or staff.

5.   Conduct interviews of Families, Children, school administrators, providers, Natural Supports, Care Coordinators, Stakeholders, and relevant State staff. The State may require that its counsel be present when the Independent Reviewer interviews any responsible State employees or staff.

6.   Testify in any case between the Parties regarding any matter relating to the implementation, enforcement, or dissolution of the Agreement, including, but not limited to, the Independent Reviewer's observations, findings, and recommendations in this matter.

7.   <u>Limitations</u>. The Independent Reviewer, and any staff or consultants retained by them, will not:

   i.   Be liable for any claim, lawsuit, or demand arising out of their activities under this Agreement. This paragraph does not apply to any proceeding for payment to the Independent Reviewer or their consultants or staff required in connection with their work under the Agreement.

27

ii. Enter, while serving as the Independent Reviewer, into any new contract with the State or the United States, unless the other Party consents in writing.

iii. Be subject to formal discovery involving the services or provisions reviewed in this Agreement, including, but not limited to, depositions, requests for production of documents, requests for admissions, interrogatories, or other disclosures.

iv. Absent a subpoena, testify in any other litigation or proceeding with regard to any act or omission of the State or any of its agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that they may have learned as a result of their performance under this Agreement, nor serve as a non-testifying expert regarding any matter or subject that they may have learned as a result of their performance under this Agreement.

G. Independent Reviewer's Budget.

1. The Independent Reviewer will submit a budget providing a detailed breakdown of expenses in performing the services required of the Independent Reviewer under this Agreement through the end of the first full State fiscal year within this Agreement, as well as subsequent years. This requirement may be in addition to any requirements of the RFP process.

2. Reimbursement and Payment.

   i. State to Bear Costs. The State will bear the cost of the Independent Reviewer, including the cost of any staff or consultants to the Independent Reviewer, pursuant to a contract between the Independent Reviewer and the State. However, the Independent Reviewer and their staff or consultants are not State agents except to the extent necessary for the State to share personally identifiable or confidential information.

   ii. Reimbursement. The State will reimburse the costs and reasonable expenses of the Independent Reviewer pursuant to a contract between the State and the Independent Reviewer up to the limits of the contract, which shall not exceed $900,000 for three years.

H. Monthly Statements. The State's contract with the Independent Reviewer will require the Independent Reviewer to submit monthly statements to the State, detailing all expenses the Independent Reviewer incurred during the prior month.

## XII.   JURISDICTION AND ENFORCEMENT

A.   The U.S. District Court for the District of Maine (the "Court") has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345.

B.   The Agreement will be interpreted in accordance with federal law and the laws of the State of Maine.

C.   Upon execution of this Agreement, the Parties shall file a joint motion with the Court pursuant to Federal Rule of Civil Procedure 41(a)(2), requesting that the Court retain jurisdiction over the case for purposes of enforcing the Agreement in accordance with its terms and for its duration.

D.   This Agreement will become effective only upon the Court's approval of the Agreement and entry of an order under Federal Rule of Civil Procedure 41(a)(2), retaining jurisdiction over this case for the purposes of enforcing the Agreement in accordance with its terms and for its duration. In the event the Court declines to enter an order retaining jurisdiction to enforce this Agreement in accordance with its terms and for its duration, this Agreement shall become null and void and the United States will have the right to revive any claims that may be otherwise barred by operation of this Agreement.

## XIII.   TERMINATION

A.   The Agreement shall terminate six years from the Effective Date if the State is in substantial compliance with the Agreement, without further action of the Court, unless otherwise terminated, canceled, or extended. Therefore, the Agreement, unless otherwise terminated, canceled, or extended, shall terminate six years after the Effective Date unless:

1.   The Parties jointly ask the Court to terminate the Agreement before the termination date, provided that the State has substantially complied with the Agreement and maintained substantial compliance for one year; or

2.   The United States disputes that the State is in substantial compliance with the Agreement as of six months prior to the termination date. Both parties may present briefing and exhibits to the Court before the Court rules on the United States' motion. The burden shall be on the State to demonstrate that it has substantially complied with the Agreement and maintained substantial compliance for at least six months.

## XIV.   GENERAL PROVISIONS

A.   <u>Binding Agreement</u>. This Agreement is binding on the Parties, by and through their officials, agents, employees, and successors for the term of this Agreement. To the extent that the State decides to contract with or otherwise assign a third party to implement any actions relating to compliance with this Agreement, the

third party's actions or inactions do not constitute a defense to non-compliance. 28 C.F.R. § 35.130(b)(1). The State will align the terms of any such contracts with its obligations under this Agreement and will ensure that contracted parties and agents take all actions necessary for the State to comply with the provisions of this Agreement.

B.   <u>Protections Against Retaliation for Complainants, Witnesses, and Whistleblowers</u>. The State will not retaliate against any individual who (1) opposes any act or practice that violates this Agreement, (2) has made or may make a complaint related to this Agreement, or (3) has testified or may testify, has assisted or may assist, or has participated or may participate in any manner in an investigation, proceeding, or hearing related to this Agreement. The State will timely and thoroughly investigate any allegations of such retaliation and take any appropriate corrective actions. The State will promptly report to the United States these allegations of retaliation.

C.   <u>Protections Against Coercion and Retaliation for Children</u>. The State will refrain from, and take reasonable steps to prevent Out-of-Home Placement staff, hospitals, Community-Based Service providers, or State contractors from: (1) pressuring any Child or their Family to choose to receive behavioral health services outside of a Family Home and/or to decline Community-Based Services, or (2) subjecting any Child or their Family to any form of retaliation by out-of-home staff, hospitals, State staff, or State contractors for seeking alternatives to behavioral health services outside of a Family Home. The State will timely and thoroughly investigate any allegations of such pressure or retaliation by State staff or a provider of covered services and take any appropriate corrective actions. Supporting the Informed Choice of a Family or Child for the Child to receive services outside of a Family Home shall not constitute "pressure" under this section.

D.   <u>Voluntary Settlement</u>. The Parties represent and acknowledge that this Agreement is the result of extensive, thorough, and good-faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims or allegations set forth in the Complaint in *United States v. Maine*, case number 1:24-cv-00315. Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement. No other group, individual, or agency of the United States government, is bound by or waives or resolves any claims related to this Agreement.

E.   <u>Amendment of Programs</u>. The State reserves the right to amend its programs, including children's behavioral health services, so long as the State timely apprises the United States and Independent Reviewer of any and all proposed amendments that are relevant to this Agreement, and provide assurances that the amendments, if adopted, will not hinder the State's compliance with this

Agreement. The continued receipt of services under the MaineCare Program by any Child shall be contingent upon the Child's remaining a Maine resident eligible for MaineCare services.

F.    Ex Parte Communications. Neither Party may engage in *ex parte* communications with the Court.

G.    Modifications. This Agreement may be modified only by consent of the Parties in writing, signed by both Parties and approval of the Court except that the Parties may extend any time limit or deadline in this Agreement, other than the termination date, by mutual written consent without Court approval.

H.    Third-Party Challenges. The Parties will promptly notify each other of any judicial or administrative challenge to this Agreement or any portion thereof, and both Parties must defend against any challenge to the Agreement.

I.    No Third-Party Beneficiaries. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly no person or entity may assert any claim or right as a beneficiary under this Agreement in any civil, criminal, or administrative action. This Agreement is not intended to expand the right of any person or entity to seek relief against the State or their officials, employees, or agents.

J.    Failure to Enforce Not a Waiver. The United States' failure to enforce any benchmark, timeline, or other provision of this Agreement will not be construed as a waiver of any enforcement rights.

K.    Entire Agreement. This Agreement constitutes the entire agreement between the United States and the State in this matter. No other statement, promise, or agreement, either written or oral, made by any Party or agents of any Party, that is not contained in this Agreement, including its Appendices, is enforceable.

L.    Reviewing Compliance. The Independent Reviewer and the United States may review compliance with this Agreement at any time. The State will cooperate with efforts to monitor compliance with this Agreement. The Independent Reviewer, any staff/consultants hired by the Independent Reviewer, and the United States will have full access to the people, places, and documents that are necessary to assess the State's compliance with and implementation of this Agreement, consistent with the Parties' confidentiality order, Section IX.B.4.i. Access will include departmental or individual medical and other records pursuant to the confidentiality order, Section IX.B.4.i. Other than to carry out the express functions as set forth herein, both the United States and the Independent Reviewer will hold information received to monitor compliance with this Agreement in strict confidence and to the greatest extent possible under federal and state law.

M.    Impossibility. Noncompliance with this Agreement due to circumstances outside of the State's control that are unanticipated, unpreventable, and unavoidable and

make it impossible to perform the Agreement's requirements will not constitute a breach of this Agreement.

N.     <u>Litigation Holds</u>. For purposes of the Parties' preservation obligations under Federal Rule of Civil Procedure 26, as of the Effective Date, litigation is not "reasonably foreseeable" about the matters described in the findings letter the United States issued to the State on June 22, 2022. To the extent that either Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this findings letter, the Party need not maintain the litigation hold.

O.     <u>Severability</u>. If any provision of this Agreement is found to be invalid, unenforceable, or otherwise contrary to applicable law after the Effective Date, the other terms of the Agreement shall nonetheless remain in effect.

P.     <u>Notice</u>. Any notices or responses necessary under this Agreement will be sent by electronic mail to the recipient's counsel of record.

## XV.   DISPUTE RESOLUTION

A.     <u>Informal Dispute Resolution</u>. The Parties agree to work collaboratively to achieve the purpose of this Agreement and will attempt to resolve informally any disagreements that may arise. If a dispute arises over the language or construction of this Agreement or its requirements, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution before seeking a judicial remedy. The Parties may seek the assistance of the Independent Reviewer in resolving any disputes.

B.     <u>Formal Dispute Resolution</u>.

1.     If the United States believes that the State is failing to fulfill any obligation of this Agreement during the pendency of the Agreement, then the United States will notify the State in writing of the alleged non-compliance, and request that the State correct the non-compliance, before initiating any court proceeding. The State will have 30 days to respond to the United States in writing. If the United States believes that any alleged non-compliance poses an immediate and serious risk to the life, health, or safety of a Child, the United States will notify the State and request that the State correct the non-compliance within a shorter time proposed by the United States or will seek a judicial remedy.

2.     In such written response, the State will, for each allegation of non-compliance, either: (a) accept (without necessarily admitting) the allegation of non-compliance and propose a curative action plan describing all steps that the State will take to cure the non-compliance and the dates by when it will take these steps; or (b) deny non-compliance.

3.     If the State fails to respond within 30 days, or a shorter time proposed by the United States in the event of immediate and serious risk to the life, health, or safety a Child, or proposes a curative action plan that the United States deems insufficient, then the United States may seek a judicial remedy.

4.     If the State responds in a timely manner and proposes a curative action plan, then the United States may accept the State's proposal or offer a counterproposal for a different curative action plan. If the Parties reach an agreement that varies from the Agreement's provisions, the new agreement must be in writing, signed by the Parties, and subject to Court approval per Section XIV.G. If the Parties fail to reach agreement on a curative action plan, the United States may seek a judicial remedy.

C.     The processes described in this Section are not required prior to seeking a judicial remedy when the United States believes that any alleged non-compliance related to conditions or practices poses an immediate and serious risk to the life, health, or safety of a Child. In that event, the United States may immediately seek a judicial remedy.

D.     The processes described in this Section are not required if the United States believes that the State has failed to fulfill any obligation of this Agreement as of six months prior to the Agreement's termination date.

FOR PLAINTIFF UNITED STATES OF
AMERICA

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
ANNE S. RAISH
Principal Deputy Chief
JENNIFER K. MCDANNELL
Deputy Chief

*Victoria Thomas*
Victoria Thomas (Nov 22, 2024 16:37 EST)
_____

VICTORIA THOMAS
MARGARET GIRARD
DANIELLE B. ROSENTHAL
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dated:  Nov 22, 2024

FOR DEFENDANT STATE OF MAINE

*Sara Gagne-Holmes*
Sara Gagne-Holmes (Nov 22, 2024 15:51 EST)
_____

SARA GAGNÉ-HOLMES
Commissioner
Maine Department of Health and Human
Services

Dated:  Nov 22, 2024

*Aaron M. Frey*
_____

AARON M. FREY
Maine Attorney General
Office of the Maine Attorney General

Dated:  Nov 22, 2024

## APPENDIX A: DEFINITIONS

This Agreement references the following defined terms throughout:

A. **Behavioral Health Disabilities**: Children with Behavioral Health Disabilities are individuals up to their 21st birthday with mental health and/or developmental disabilities, as defined at 28 C.F.R. § 35.108(a)(1), who have behavioral health needs.

B. **Care Coordination**: A service planning and coordination process provided to individuals under the age of 21 for selecting and organizing services that a Child may need to live in their Family Home, based on the Wraparound Planning Principles described below. HFW is a type of Care Coordination, defined below. Where not otherwise specified, "Care Coordination" is an umbrella term inclusive of HFW.

C. **Care Coordinator**: Care Coordinators support obtaining access for Children to Community-Based Services and have specialized knowledge and training in Care Coordination that is informed by the Wraparound Planning Principles, which are based on those developed by the National Wraparound Initiative. Care Coordinators that deliver HFW are referred to as HFW Care Coordinators, defined below. Where not otherwise specified, "Care Coordinator" is an umbrella term inclusive of HFW Care Coordinators.

D. **Child/Children**: Individuals who are covered by this Agreement because they meet the requirements at Section II.

E. **Child and Family Team**: A Child and Family Team is a group of people, chosen with the Child and Family and connected to them through natural, community, and formal support relationships, that develops and implements the ISP. The Child and Family Team includes the Child, the Family, Natural Supports chosen by the Child and Family, service providers, and, as appropriate, representatives of the Child's school and other community contacts. The Child and Family Team is led by a Care Coordinator.

F. **Community-Based Services**: Individualized, person-centered, flexible, and culturally and linguistically competent behavioral health services provided to individuals under the age of 21, delivered in integrated settings, with an emphasis on positive behavioral supports, to help Children live in Family Homes. These services are available statewide and help recipients lead integrated lives with participation in community life consistent with their preferences and needs, and those of their Family. Community-Based Services are delivered at times and locations that a Child and their Family selects. They may be defined in the State's Medicaid State Plan, defined in a Medicaid waiver, or State-funded. They include, but are not limited to: identification of strengths, needs, and services, defined at Section III; and the Community-Based Services included in Section IV.

G. **Community Provider**: A behavioral health service provider who, through an agency or on an individual basis, provides Community-Based Services to individuals under the age of 21.

H. **Community Return**: Community Return is the successful process of discharging a Child from an Out-of-Home Placement to a Family Home and furnishing Timely Community-Based Services accepted by the Child and/or their Family to maintain the Child in a Family Home long-term. Preparation for Community Return begins on a Child's first day in an Out-of-Home Placement.

I. **Emergency Department Stay**: An Emergency Department Stay occurs when a Child: (1) enters an emergency department primarily because of a behavioral health need, and (2) remains unnecessarily in an emergency department because of a behavioral health need. A stay is unnecessary for purposes of this definition when the stay extends because of the Childs's unmet behavioral health needs.

J. **Family/Families**: The parent, guardian, or legally responsible party of a Child. When referring more generally to a family, to include, for example, foster family members, extended family, and siblings, this Agreement uses lowercase "family."

K. **Family Home**: An integrated, non-disability-specific setting in which Children live with a family who help the Child go to school, recreate, and receive services. A Family Home generally means a parental home. A Family Home also includes: (1) a kinship home, which is the home of an individual who is related to the Child by blood, marriage, or adoption; or who is a Family friend whose close relationship is acknowledged by the Child's Family or by the Child; or who is unrelated to the Child but has an emotionally significant relationship with the Child or Child's Family; (2) a guardian's home; (3) a foster care home in which a foster care parent lives full-time; (4) a Therapeutic Foster Care Home (defined at Section IV.E.5), for Children in the child-welfare system; or Therapeutic Intensive Home (also defined at Section IV.E.5), for Children both in and out of the child-welfare system; or (5) a house or apartment owned or rented by the Child, if the Child has reached the age of majority or is an emancipated minor.

L. **HFW Care Coordinator**: HFW Care Coordinators connect Children to Community-Based Services and have specialized knowledge and training to provide HFW.

M. **High-Fidelity Wrap Around Service (HFW)**: An intensive, team based type of Care Coordination available to those Children receiving Behavioral Health Home ("BHH") services under MBM Chapter II, Section 92 for selecting and organizing the services that an eligible Child needs to address their behavioral health challenges when involved in multiple child-serving systems and at risk of or in an Out-of-Home Placement, based on the Wraparound Planning Principles. HFW is a structured approach to service planning for Children that encourages flexibility and creativity in determining how to meet the Child's behavioral health needs and is intended to offer individualized, coordinated, family-driven care to meet the complex needs of Children in need of Medium to High-Intensity Behavioral Health Services (and their

Families) who are at risk of placement in, or while preparing for Community Return from, Out-of-Home Placements, and who may experience emotional, behavioral, safety, or mental health difficulties.

N. **Informed Choice**: A choice that a Family and/or a Child make about the setting where the Child will live and receive services, after receiving information about and being considered for all of the behavioral health services offered, paid for, and/or administered by the State for which the Child is eligible under the Single Assessment, and with the assumption that the Child's service needs can be met in a Family Home, with reasonable modifications if appropriate. To ensure the Child and their Family can make an Informed Choice, the State must provide information about services the Child would receive in a Family Home; including, for example, educating the Child and their Family about the benefits of the Child living in a Family Home; facilitating, when possible and appropriate, meetings with Community Providers, Therapeutic Foster Care Home parents, and Therapeutic Intensive Home parents who could serve the Child in a Family Home; and providing opportunities, when available, to meet other Children and Families who are receiving services in a Family Home. The State must identify and address, when possible, any concerns or objections that the Child or their Family may have about living and receiving services in a Family Home. A Child and Family's Informed Choice can and may change.

O. **Medium or High Intensity Behavioral Health Services**: These are services provided to individuals under the age of 21 and include Section 28 Rehabilitative and Community Support Services for Children with Cognitive Impairment and Functional Limitations ("RCS"): Standard Services, Specialized Services, and BCBA Services; Section 65 Behavioral Health Services: Intensive Outpatient Programs, Assertive Community Treatment ("ACT"), Children's Home and Community Based Treatment ("HCT"); Multi-Systemic Therapy; Functional Family Therapy; Hi-Fidelity Wraparound for Behavioral Health Homes under Section 92; Section 97 Private Non-Medical Institutions: Children's Residential Care Facility Services; Therapeutic Foster Care Homes; Therapeutic Intensive Homes; and Section 107 Psychiatric Residential Treatment Facility Services.

P. **MaineCare Benefits Manual ("MBM")**: As of the Effective Date, MBM can be found at 10-144 Code of Maine Rules, ch. 101.

Q. **Natural Supports**: A Natural Support is a person who (1) is not employed by a provider agency; (2) knows a Child personally; and (3) helps the Child live in and engage with the community.

R. **Out-of-Home Placement**: An Out-of-Home Placement is a residential setting other than a Family Home, whether within Maine or out-of-state, where a Child receives services primarily based on a behavioral health need. An Out-of-Home Placement is not a violation of this Agreement if a Family or Child, through the service planning process or otherwise, makes an Informed Choice that the Child will receive services in an Out-of-Home Placement. An emergency department is not an Out-of-Home Placement.

S. **Return Plan**: When the Child and Family Team decides that, with planning and services, a Child in an Out-of-Home Placement can return to a Family Home, the Care Coordinator will work with the team to develop a Return Plan. The Return Plan is part of the ISP and lists the specific steps that will be taken so the Child can return to a Family Home and continue to receive necessary services. The Child and Family Team sets a planned discharge date in the Return Plan.

T. **Stakeholders**: Stakeholders include Children, Families, and individuals who provide any services to Children such as advocates, advocacy organizations, attorneys, Care Coordinators, children's counselors, child welfare leadership and staff, service providers, foster families, family court judges, juvenile justice leadership and staff, juvenile criminal court judges, law enforcement personnel, Natural Supports, peer service providers, pediatricians, child psychologists, child psychiatrists, social workers, school staff, and therapists.

U. **Timely/Timeliness**: To be Timely, services must be available in time to prevent Children from unnecessarily: (1) entering an Out-of-Home Placement for the purpose of receiving behavioral health services; (2) remaining in an Out-of-Home Placement; or (3) remaining in an emergency department. For purposes of Timeliness, a Child "unnecessarily" enters or remains in an Out-of-Home Placement when the Child and/or Family are eligible for Community-Based Services and are awaiting the start of such services and the delay is the primary reason the Child enters or remains in an Out-of-Home Placement. For purpose of Timeliness, a Child "unnecessarily" remains in an emergency department when the stay extends because of the Child's unmet behavioral health needs.

V. **Wraparound Planning Principles**: The Wraparound Planning Principles are based on those established by the National Wraparound Initiative. These ten principles are:

1. Family Voice and Choice: Family and Child perspectives are gathered and prioritized throughout the ISP development and Care Coordination processes.

2. Child and Family Team Based: The Child and Family Team consists of individuals agreed upon by the Family and Child and committed to them through informal, formal, and community support and service relationships.

3. Involvement of Natural Supports: The Child and Family Team actively seeks out and encourages the full participation of Child and Family Team members drawn from the Child's Family and others in the Child's networks of relationships chosen by the Child.

4. Collaboration: Child and Family Team members work cooperatively and share responsibility for developing, implementing, monitoring, and evaluating a single ISP.

5. Community-based: The Child and Family Team implements service and support strategies that take place in the most inclusive, most responsive, most accessible, and most integrated settings appropriate for the Child's needs

possible, and that safely promote the Child and Family integration into home and community life.

6.      Culturally competent: Wraparound service delivery demonstrates respect for and builds on the values, preferences, beliefs, culture, and identity of the Child and Family, and their community.

7.      Individualized: To achieve the goals laid out in the ISP, the Child and Family Team develops and implements a customized set of strategies, supports, and services.

8.      Strengths-based: Wraparound identifies, builds on, and enhances the capabilities, knowledge, skills, and assets of the Child and Family, their community, and other Child and Family Team members.

9.      Persistence: Despite challenges, the Child and Family Team persists in working toward the goals included in the ISP.

10.     Outcome-based: The Child and Family Team ties the goals and strategies of the ISP to observable or measurable indicators of success, monitors progress in terms of these indicators, and revises the plan accordingly.

## APPENDIX B: MINIMUM DATA ELEMENTS

A.  The Data Collection and Analysis Plan will include the following minimum data elements:

    1.    Tracking the number of individual calls to the crisis hotline requesting crisis services for Children, the response time for providing requested services, and any follow-up after the call;

    2.    For each Child identified for a Single Assessment—

        i.    The Child's date of birth, city of residence, referral source, and services recommended by the individualized needs assessment to identify all necessary services to meet the Child's behavioral health needs;

        ii.    Status of Care Coordination, including the length of time between the Single Assessment and the first meeting between the Family, Child, and Care Coordinator, and additional data such as date of the initial ISP development, the date of the last update to each Child's ISP, and the list of members on the Child and Family Team;

        iii.    The Child's current address, designating the type of setting;

        iv.    Whether the Child has been identified for Community Return, the date they were so identified, and the current status;

        v.    Single Assessment referral source;

        vi.    In a randomized sample of cases, comparison of authorized services to received services, by type and quantity; and

    3.    The number of Community Providers available to provide Community-Based Services, including peer supports, and number of Therapeutic Intensive Homes and Therapeutic Foster Care Homes.

B.  Performance Indicators. These measures will be included in the State's evaluation of the effectiveness of its Implementation Plan, i.e., process evaluation, as required by Section IX. In developing measures, the State and the Independent Reviewer will include the following, non-exhaustive, list of examples related to Community-Based Services:

    1.    Overall prevalence and incidence of Children in Out-of-Home Placements;

    2.    Average length of stay of Out-of-Home Placement;

    3.    Review of random sample of ISPs for detailed contingency plans in the event of Community Provider unavailability. The State will determine sample size in concert with the Independent Reviewer;

4.      Child and Family service satisfaction and experiences with Community-Based Services;

5.      All-cause hospital admission or emergency department visits for Children with ISPs;

6.      Degree and frequency of follow-up by Community Providers and Care Coordinators after hospitalization or an emergency department visit for behavioral health;

7.      Time between the Single Assessment and the individualized needs assessment to identify all necessary services to meet the Child's behavioral health needs;

8.      Changes in cultural competence competency levels within the organizations delivering services outlined in this Agreement regarding infrastructure and services provided;

9.      Percent of parents/guardians who found paperwork to receive or retain services to be clearly written and straightforward;

10.     Partnerships with advocacy groups;

11.     Number and quality of trainings provided across Stakeholders; and

12.     Other performance indicators needed to gather actionable, meaningful, useful, and informative data that specifically serves necessary to demonstrate compliance with the Agreement.

## APPENDIX C: TRAINING

A.  As required by Section VI, the mandated training policy and curriculum of select, appropriate State staff, Community Providers, Care Coordinators, and service providers will:

    1.    Incorporate training implementation evaluation measures to assess fidelity to and impact of the curricula;

    2.    Incorporate measures related to changes in knowledge, changes in attitude, development of multiple training modalities, and feedback from those taking the training; and

    3.    Establish training curricula tailored to training audience, which will address: the core requirements of this Agreement; cultural competency; motivational interviewing, an evidence-based, person-centered approach to facilitate behavioral change; Family engagement; and the values of community integration and having a Child live in a Family Home. The curricula will include initial and continuing training. The State will seek input from Children and their Families on the curriculum and will involve Children and their families/guardians in preparing and conducting the training, as appropriate. Training will be offered with sufficient frequency and intensity to adequately train all Community Providers, Care Coordinators, and other service providers. Curriculum development will include provisions for evaluating the quality of the training program, changes to or acquisition of competencies, and impact of training on person-centered service delivery consistent with this Agreement.

B.  Review. No later than 12 months following the Effective Date of the Agreement, the State will send its proposed training policy and curricula to the Independent Reviewer for review and comment. The Independent Reviewer may provide technical assistance on the State's proposed training policy and curricula and its consistency with this Agreement. The State will provide annual updates to the United States and Independent Reviewer about any modifications to the training policy or curricula.